Maria M. AGOSTO–DE–FELICIANO, et al., Plaintiffs, Appellees,

v.

Awilda APONTE–ROQUE, etc., et al., Defendants, Appellants.

Maria Teresa TORRES–HERNANDEZ, et al., Plaintiffs, Appellees,

v.

Pedro A. PADILLA, etc., et al., Defendants, Appellants.

Maria Teresa TORRES–HERNANDEZ, Plaintiff, Appellant,

v.

Pedro A. PADILLA, etc., et al., Defendants, Appellees.

Nos. 86–1300, 86–1643 and 86–1644.

United States Court of Appeals, First Circuit.

Heard Nov. 4, 1987.

Decided Dec. 8, 1989.

---

Jose Hamid Rivera with whom, Saldana, Rey, Moran & Alvarado, Hato Rey, P.R., Hector Rivera Cruz, Secretary of Justice, Bayamon, P.R., and Rafael Ortiz Carrion,

Sol. Gen., were on supplemental brief for defendant-appellant, Awilda Aponte–Roque.

Pedro Juan Perez Nieves with whom, Saldana, Rey, Moran & Alvarado, Hato Rey, P.R., Hector Rivera Cruz, Secretary of Justice, Bayamon, P.R., and Rafael Ortiz Carrion, Sol. Gen., were on supplemental brief, for Pedro A. Padilla, et al.

Pedro Mirando Corrada, San Juan, with whom, Hector Urgell Cuebas and Jose Roberto Feijoo, Santurce, P.R., were on supplemental brief for plaintiffs-appellees, Maria M. Agosto–De–Feliciano, et al.

Eliezer Aldarondo Ortiz, Hato Rey, P.R., Miguel Pagan, San Juan, P.R., and Aldarondo & Lopez Bras, on supplemental brief, for Maria Teresa Torres–Hernandez.

Before CAMPBELL, Chief Judge, and COFFIN, BOWNES, BREYER, TORRUELLA and SELYA, Circuit Judges.

COFFIN, Senior Circuit Judge.

Panel decisions in these two cases were withdrawn and both cases were reheard en banc. The issues common to both are whether and under what standards the protections of *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), should be available to government employees whose employment, while not terminated, was subjected to less advantageous conditions and responsibilities because of the employ-ees' political affiliation. We convey our views on those legal questions here, and remand for application of the standard to the particular facts of each case.

These cases represent a second wave in a tide of litigation arising out of changes in political administrations in Puerto Rico. The first wave involved outright dismissals and has produced a substantial number of opinions.[1] In all of these our task was to determine, in accordance with both *Elrod* and *Branti*, (1) whether the agency in which a discharged plaintiff had served was engaged in activity whose direction or pace properly could be affected by partisan political considerations, and (2) whether the particular position of the plaintiff was a policymaking or confidential one. On the basis of these criteria, we considered whether the plaintiff's job was protected against politically motivated discharge. Here the plaintiffs have protected status, and they have not been discharged; the question at issue is what type of employer action short of dismissal will support a claim for violation of the plaintiffs' right of free political association.

## I.  *Facts* [2]

In November 1984, the Popular Democratic Party (PDP) won the gubernatorial election in Puerto Rico. Defendant Awilda Aponte Roque, a member of the PDP, was then named Secretary of the Department of Public Education. Aponte in turn named defendant Maria P. Scott as director of the Department's Humacao Region.

---

**1.** *See, e.g., Figueroa Rodriguez v. Lopez Rivera*, 878 F.2d 1478 (en banc) (1st Cir.1989); *Caro v. Aponte Roque*, 878 F.2d 1 (1st Cir.1989); *Cordero v. DeJesus–Mendez*, 867 F.2d 1 (1st Cir.1989); *Rodriguez Burgos v. Electric Energy Authority*, 853 F.2d 31 (1st Cir.1988); *Estrada Izquierdo v. Aponte Roque*, 850 F.2d 10 (1st Cir.1988); *Hernandez–Tirado v. Artau*, 835 F.2d 377 (1st Cir. 1987); *Morales Morales v. Arias*, 834 F.2d 255 (1st Cir.1987); *Nunez v. Izquierdo–Mora*, 834 F.2d 19 (1st Cir.1987); *Zayas–Rodriguez v. Hernandez*, 830 F.2d 1 (1st Cir.1987); *Vazquez Rios v. Hernandez Colon*, 819 F.2d 319 (1st Cir.1987); *Perez Quintana v. Gracia Anselmi*, 817 F.2d 891 (1st Cir.1987); *Raffucci Alvarado v. Zayas*, 816 F.2d 818 (1st Cir.1987); *Rosado v. Zayas*, 813 F.2d 1263 (1st Cir.1987); *Mendez–Palou v. Rohena–Betancourt*, 813 F.2d 1255 (1st Cir.1987);

*Monge–Vazquez v. Rohena–Betancourt*, 813 F.2d 22 (1st Cir.1987); *Cheveras Pacheco v. Rivera Gonzalez*, 809 F.2d 125 (1st Cir.1987); *Rodriguez Rodriguez v. Munoz Munoz*, 808 F.2d 138 (1st Cir.1986); *Jimenez Fuentes v. Torres Gaztambide*, 807 F.2d 236 (1st Cir.1986) (en banc); *De-Choudens v. Government Development Bank of Puerto Rico*, 801 F.2d 5 (1st Cir.1986) (en banc); *De Abadia v. Izquierdo Mora*, 792 F.2d 1187 (1st Cir.1986).

**2.** We detail here the facts in *Agosto de Feliciano v. Aponte Roque*, No. 86–1300, 1987 WL 39747, to provide context for the legal issues we decide herein. We see no need to present as well the factual background of *Torres Hernandez v. Padilla*, Nos. 86–1643 and 86–1644, 1987 WL 39748, which involves only one additional plaintiff.

Plaintiffs, all members of the New Progressive Party (NPP), are officials in the Humacao Region and have been "career" employees with the Department for more than twenty years.[3]

Plaintiffs' action under 42 U.S.C. § 1983 alleges that political discrimination resulted in a drastic change and reduction of their duties, and that this violated the First and Fourteenth Amendments of the Constitution. The relevant testimony in their jury-waived trial may be summarized as follows. Defendant Scott assumed office on January 14, 1985. Within four days, without having met with any of the plaintiffs, including Maria Agosto de Feliciano, her immediate subordinate, and without having developed any clear reorganization plan, she issued a memorandum setting forth new "guidelines for the Department." These removed responsibilities from plaintiffs, and required plaintiffs to obtain approval for their work from other employees who were PDP members and who previously had held positions subordinate to plaintiffs. Phone calls, mimeographing, photocopying and typing were to be similarly authorized.

According to several plaintiffs, defendant Scott explained that her actions stemmed from the recent political change. When plaintiffs wished to meet with her to discuss their problems, she insisted upon including her "confidence group"—PDP members who previously had been subordinate to plaintiffs. Plaintiffs twice complained by letter to defendant Aponte of being deprived of some of their functions, which had been reassigned to lower level personnel, and of their inability to communicate with defendant Scott. Aponte's only response was to indicate that she was referring the matter to Scott.

We now summarize the evidence with regard to the specific changes in the plaintiffs' responsibilities:

*Maria Agosto de Feliciano.* Her prior job description consisted of some 26 respon-

sibilities. Although the list appears somewhat inflated by bureaucratic jargon, it is nonetheless obvious that as the Assistant Regional Director she had varied supervisory and other responsibilities, including representation of the regional director in all activities in which the director is unable to participate. She also was in charge of the office in the regional director's absence. After defendant Scott's arrival on the scene, Agosto's duties were confined to the special education program and to signing checks. She no longer oversaw general supervisors.

*Virginia Diaz Diaz.* She served as liaison between the Department of Public Education and private schools, coordinated the teaching practice program in the Project School without grades, and directed a regionwide committee on school organizations. After defendant Scott's arrival, she continued to work with schools without grades and private schools, but no longer directed the school organizations committee. In addition, she had to ask defendant Scott or Scott's secretary for permission to use a telephone, to make photocopies, or to have typing done.

*Luz Camacho de Ortiz.* Her prior list of responsibilities included some 23 items, ranging from surveying needs, developing work plans, and evaluating curricula and training, to managing vocational education and supervising student organizations. After defendant Scott's arrival, she was deprived of her former supervisory duties and had the sole functions of working in connection with talented students and of supervising an elementary school science program for which she had inadequate background.

*Vincente Vasquez Castro.* His prior job description included 21 items of rather broad responsibilities in the areas of vocational education and student services. Evaluation of personnel, curriculum revi-

---

**3.** A career employee under Puerto Rico's civil service personnel system is selected strictly on merit and can be removed only for cause. Puerto Rico Public Service Personnel Act of 1975, 3 L.P.R.A. §§ 1301, 1331–1338. In contrast, confidential employees under the Act are of "free selection and removal," and are those who "intervene or collaborate substantially in the formulation of the public policy, who advise directly or render direct services to the head of the agency...." *Id.* at §§ 1350 and 1350(4).

sion, budget distribution, development of new techniques, and oversight of programs relating to school needs, transportation, and scholarship were some of them. After defendant Scott's arrival, he no longer supervised; such responsibilities were assigned to a former subordinate, a PDP member. Vasquez's sole function was partial responsibility for the school transportation program.[4]

Defendants advanced several arguments to the district court. They challenged the contention that the changes in plaintiffs' duties were politically motivated, asserting that their knowledge of plaintiffs' political affiliation was evidenced only by plaintiffs' self-serving testimony. Defendant Scott testified that the jobs held by plaintiffs had always been subject to reshaping and reassignment of duties by her predecessors, that plaintiffs' remaining responsibilities were indeed substantial ones, and that she was in the midst of a process of determining the needs of her region and, when a complete analysis had been made, she would begin "adding functions pertinent to the position[s]."

The district court held that plaintiffs had established a prima facie case of political discrimination and that the defendants had not submitted a "credible justification." 631 F.Supp. 1082 (D.P.R.1986). It granted an injunction reinstating plaintiffs to their former duties. It observed that neither defendant had raised the defense of qualified immunity, and awarded, against both defendants, compensatory damages for emotional and mental distress in the amount of $60,000 for each plaintiff, and punitive damages in the same amount for each plaintiff.

Defendants filed this appeal, making the following arguments: 1) plaintiffs have no cause of action under the First or Fourteenth Amendments; 2) defendants are entitled to qualified immunity; 3) the district court's findings of fact are erroneous; 4) the award of damages is excessive; and 5) the injunctive relief is overly broad.

## II. A Legal Standard for Adjudicating Allegedly Partisan Reallocation of Duties and Changes in Working Conditions of Civil Service Employees

### A.

The difficulties in determining whether a government employee is protected from a politically motivated discharge are considerable. *See* cases listed in note 1. As the facts of *Agosto de Feliciano v. Aponte Roque* illustrate all too well, however, the difficulties facing courts in cases involving employer action less final and definitive than dismissal are potentially enormous. They arise from the need to sift out the chaff of minor irritants and frustrations from the wheat of truly significant adverse actions.

The major issues presented in these cases are whether and under what circumstances public employer action short of dismissal, adversely affecting a career employee, based solely on the latter's political affiliation, should be held to violate the First Amendment right of free association. By definition, we no longer have the bright line threshold of dismissal present in *Elrod* and *Branti*. Our search for workable standards promises to be difficult. Indeed, Justice Powell in his dissenting opinion in *Elrod* speculated that "[t]he difficulty of formulating standards might pose a bar to judicial review of some patronage practices not before us." 427 U.S. at 377 n. 1, 96 S.Ct. at 2691 n. 1.

Other circuits have resolved these issues in widely diverging manners. The Second and Third Circuits have adopted a rather wide-open approach. *See Lieberman v. Reisman*, 857 F.2d 896, 900 (2d Cir.1988) ("Whenever under color of state law unfavorable action is taken against a person on account of that person's political activities or affiliation, it raises First Amendment concerns."); *Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir.1987) ("the constitutional viola-

---

**4.** The fifth plaintiff, Vega Diaz, was found by the district court not to have established in sufficient detail the tasks assigned to him before and after the change of government and, there-

fore, "failed to prove that there had been substantial changes in his tasks ... or that the same were changed to tasks of lesser category." No appeal was taken from this holding.

tion is not in the harshness of the sanction applied, but in the imposition of any disciplinary action for the exercise of permissible free speech"). *See also* Note, *First Amendment Limitations on Patronage Employment Practices,* 49 U.Chi.L.Rev. 181 (1982) (arguing that all politically inspired adverse personnel actions, whether or not equivalent in severity to dismissal, are unconstitutional). The Seventh and Fourth Circuits have been more restrictive. *See Rutan v. Republican Party of Illinois,* 868 F.2d 943, 949–51 (7th Cir.1989) (en banc), *cert. granted,* —— U.S. ——, 110 S.Ct. 48, 107 L.Ed.2d 17 (1989) (to be actionable, adverse personnel moves must amount to the "substantial equivalent [of] a dismissal"); *Delong v. United States,* 621 F.2d 618, 623–24 (4th Cir.1980) (similar). *But see Pieczynski v. Duffy,* 875 F.2d 1331, 1333 (7th Cir.1989) ("Harassment of a public employee for his political beliefs violates the First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing those beliefs.")

In any event, our starting point must be *Elrod* and *Branti.* We discern several teachings, either explicit or implicit, in those decisions. First, the holdings were explicitly confined to patronage dismissal cases. Justice Stewart, his concurrence necessary to form a majority in *Elrod,* made it clear that "the broad contours of the so-called patronage system, with all its variations and permutations," were not being considered. 427 U.S. at 374, 96 S.Ct. at 2690. We therefore realize that, in dealing with something less definitive than dismissals, we enter a field yet unploughed by the Court.

Second, notwithstanding the limited scope of the Court's holdings, they imply applicability of the First Amendment protection to some patronage employment decisions short of dismissal. We say this because of the Court's references to "political belief and association" as being "the core of those activities protected by the First Amendment." *See, e.g., Elrod,* 427 U.S. at 356, 96 S.Ct. at 2681. Expanding on this theme, the plurality in *Elrod* quotes, with the endorsement of Justice

Stewart, the sweeping language of *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 2697, 33 L.Ed.2d 570 (1972): " '[I]f the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited.' " 427 U.S. at 359, 375, 96 S.Ct. at 2682, 2690. This language also found favor with the majority in *Branti.* 445 U.S. at 515, 100 S.Ct. at 1293. In addition, we attach some significance to the fact that the Court in *Branti* saw fit to quote the district court's explanation, accompanying its injunction prohibiting termination of plaintiff's employment, that "[m]ere payment of plaintiffs' salary will not constitute full compliance ...," 445 U.S. at 509 n. 3, 100 S.Ct. at 1290 n. 3.

Third, our resolution of the basic questions in these cases must recognize that there are First Amendment interests on both sides. As the Court in *Elrod* stated, "It is apparent that at bottom we are required to engage in the resolution of conflicting interests under the First Amendment." 427 U.S. at 371, 96 S.Ct. at 2688. The First Amendment interest at stake on the government's side that seemed to weigh most heavily in the Court's analysis was "that representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate," *id.* at 367, 96 S.Ct. at 2686, or alternatively, the "need to insure that policies which the electorate has sanctioned are effectively implemented," *id.* at 372, 96 S.Ct. at 2689. Although this interest is not sufficient "to validate patronage wholesale," it is "not without force." *Id.* at 367, 96 S.Ct. at 2686.

## B.

What we draw from these teachings is that our task is to devise a standard for evaluating employee burdens that protects against at least some politically motivated actions short of discharge, but that also gives due breadth to the government's interest in the effective implementation of its policies. In searching for such a standard,

we first consider what level of generality is most fitting. The choices, broadly speaking, are whether to apply categorical definitions as in *Elrod* and *Branti*,[5] or to engage in very fact-specific and ad hoc analysis of the interests of an employee, the extent to which those interests have been adversely affected by a government decision, and the particular needs of government. The latter approach has been adopted by the Supreme Court in cases where employees have been dismissed in retaliation for speech activity. *See, e.g., Rankin v. McPherson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). This approach is well adapted to cases involving expression by public employees, for the form, content, manner, time, and place of expression can be infinitely varied, as can be the circumstances bearing on the employer's legitimate needs. *See* Note, *Politics and the Non–Civil Service Public Employee: A Categorical Approach to First Amendment Protection*, 85 Colum.L.Rev. 558, 567 (1985).

We believe a categorical approach is appropriate here, although it is not so obvious a choice as in *Elrod* and *Branti*. In those cases, there were fewer variables; the employer action at issue always was a discharge. In the cases we now consider, however, we face a virtually infinite number of possible employer actions that will fall along a wide spectrum of severity. The employer's interest in taking politically motivated action also will vary significantly because the jobs at issue will range from those falling just outside the core political positions excepted from the *Elrod–Branti* protection to those with far more remote links to the political process.[6] We could, therefore, attempt to weigh the impact on the employee against the government's interest in each case, constructing a kind of sliding scale of protection from political harassment.

We decline to do so not only because such a procedure seems overwhelming in light of the many possible combinations of factors, but also because we believe there are strong reasons for adopting a categorical cutoff point of severity of harm below which actions simply should not be considered a constitutionally significant burden on the employee's political association right.[7]

First, if the threshold for an actionable constitutional violation were low, we believe employees would too often resort to litigation when the employer's action was actually apolitical in nature. All employees, regardless of politics, may face a variety of lesser aggravations and inconveniences in the workplace, and a common catalogue of such non-political grievances—such as feelings of insufficient au-

5. Categorical analysis involves development of a general standard separating protected from unprotected activity that can be applied to every case. In *Elrod* and *Branti,* the Court established that employees whose jobs were categorized as policymaking, confidential, or communicative were not protected from political discharge, so long as party affiliation is an appropriate requirement for the position. *See Elrod,* 427 U.S. at 367–68, 375, 96 S.Ct. at 2686–87, 2690; *Branti,* 445 U.S. at 517–18, 100 S.Ct. at 1294–95; *Jimenez Fuentes,* 807 F.2d at 242. The Court also assumed that discharges of such individuals would be justified in light of the new administration's interests, and did not require ad hoc scrutiny of the weight of the government's interest in any particular case.

6. As did the Supreme Court in *Elrod* and *Branti,* we assume here that the employee's interest in free political association and the administration's interest in the effective implementation of the electorate's preferred political policies are substantial. *Elrod* and *Branti* tell us, however, that when the administration's interest is at its highest point, it outweighs the individual's right to be free from political pressure. Thus, an employee in a policymaking position may be discharged solely on the basis of political affiliation.

7. Our reference to a "categorical" approach does not mean that the trial court would be freed from a detailed inquiry into what happened to the employee and why the government took the actions it did. Rather, once the court has found the facts, it will look at whether the employee has met the standard we set today for proving an actionable First Amendment violation. This is categorical in the sense that the factfinder will be required to apply the standard and will not be free simply to balance the interests at stake in the individual case.

tonomy, complaints about unpleasant new duties, or restricted access to the telephone—could all too easily, and incorrectly, be ascribed to partisan political motivation. Although the government employer could be expected to prevail in cases where there was no political motivation for the actions, we should discourage employees from drawing the courts into the day-to-day operations of government.

Second, unlike in *Rankin, Connick,* and *Pickering,* where the public employer's asserted interest was in efficiency, the government's competing interest in a political patronage case also is based in the First Amendment. *See Elrod,* 427 U.S. at 371, 96 S.Ct. at 2688 (recognizing administration's interest in the effective implementation of political policies that presumably were sanctioned by the electorate). This interest would be undervalued if administrations could be forced to defend in court every decision to adopt new procedures, to create new organizational structures, and to reallocate functions. Thus, again, while the government could be expected to prevail when it takes actions in furtherance of its interest, and should lose when the only motive is to reward or punish political friends or foes, we should seek a method for resolving valid complaints that will avoid excessive court intervention by giving some breathing room to legitimate efforts to make good on promises to the electorate.

Third, we believe that even some politically motivated interactions between high-level policymakers and protected civil service employees should not trigger a constitutional cause of action. These less serious occurrences—social preference or pressure, nuances affecting status and prestige, and articulated or indirectly manifested slurs and gibes—may be an all too real by-product of our long-standing organization of political life into two or more parties. *See Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). We believe it appropriate to require the citizen who believes and affiliates with a political party to develop a suitably thick skin to withstand the rigors of our societal, often highly politicized, life.

In short, these factors suggest that insubstantial changes in an employee's work conditions and responsibilities, even when politically motivated, either would not reasonably chill the employee's exercise of the right to free political association, or would cause a level of burden that is almost certainly outweighed by the government's need to protect its own interest in implementing new policies. We therefore believe our task is to develop a general standard that would at the same time protect the rights of political belief and association against real and substantial assaults, and yet also protect a government from a legal battle over every move it makes to implement its policies. We believe this balance is reached, and a cause of action for violation of the employee's free association right therefore stated, only when the government's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party.

### C.

We thus turn to our primary task, the creation of a workable standard for recognizing a violation of a civil servant's freedom of association. We have pondered and labored at length in an effort to define this constitutional violation in a way that will neither unduly strain governments with harassing lawsuits nor unduly discourage employees with formidable complaints from asserting their rights. We have found that no simple catch phrase suffices to meet these dual goals. In particular, we have rejected as unhelpful the "constructive discharge" or "tantamount to dismissal" formula adopted by at least two other circuits. *See Rutan,* 868 F.2d at 949–51; *Delong,* 621 F.2d at 623–24. If we used such a standard, we would be holding that an employee's First Amendment right is significantly burdened only when he or she has, in effect, been fired for the exercise of that right. But comparing what happened to an employee in this context with the repercussions of discharge risks undervaluing the employee's right. Pen-

sion rights, seniority, fringe benefits, and the security represented by government employment all may be retained in these cases—as they were in the instant one—because the plaintiffs nominally may continue to hold the same jobs they previously had held. Moreover, many of the employees involved in such cases would be likely to endure severe hardship before contemplating resignation. In the case of a senior civil servant, for example, mobility is likely to be extremely limited and only rather cataclysmic changes could reasonably induce one to quit. To link a constitutional violation to a finding of "constructive discharge," or to conditions "tantamount to dismissal," may therefore allow an impermissibly high burden on the free exercise of the political association right. Thus, we think it ill-advised to adopt this short-hand method of describing the burden that we believe is sufficient to state a cause of action for violation of an employee's free association right.

We also have rejected as insufficiently revealing the tag "constructive demotion," although we note that the results of the standard we are about to describe would, in many respects, mirror those of a constructive demotion analysis. We nevertheless decline to adopt the short-hand phrase because when a bureaucrat is denied responsibilities and perquisites appropriate to the position occupied, it does not necessarily mean that he or she has been accorded those appropriate to a lower level. In our view, a "constructive demotion" inquiry would simply obfuscate matters by raising the distracting question of the level to which the plaintiff has descended.[8]

We have, however, found instructive a precedent of our own that is repeatedly cited for its discussion of "constructive discharge," *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114 (1977). That case has guided us not by its "tantamount to dismissal" standard but by two aspects of its methodology: first, the technique of canvassing specific injuries to evaluate the severity of the change wrought in the plain-

tiff's employment position, and second, judging the change against a standard that asks whether the new work situation is "unreasonably inferior to his prior position." In *Alicea Rosado*, we found no constructive discharge because the duties of the transferred plaintiff remained appropriate for his rank, even though he was no longer in charge of an office. Although this meant a "limited blow to [his] pride," 562 F.2d at 119, and the transfer would have increased his unreimbursed commuting costs, we concluded that "[a] more drastic reduction in the quality of working conditions [would be] needed," *id.* at 120, to constitute a constructive discharge.

We conclude that a similar technique, and a similar standard of severity of harm, are appropriate here, where our goal is to determine whether the new work conditions would place substantial pressure on even one of thick skin to conform to the prevailing political view. This level of burden is reached, we believe, when the employer's challenged actions result in a work situation "unreasonably inferior" to the norm for the position. To determine whether such a reduction has occurred—in other words, to evaluate whether the changes were sufficiently severe to warrant the "unreasonably inferior" description—the factfinder should canvass the specific ways in which the plaintiff's job has changed. Because we recognize that the "unreasonably inferior" standard is not self-defining, and could be subject to widely varying interpretations, we offer below some guidelines for judging severity. These are, of course, not prescriptive, but are designed to demonstrate the severity of change necessary to constitute a violation. We are well aware of the impossibility of devising detailed prescriptions that would cover future cases. We therefore caution that the suggested results in the following illustrations might well be altered by even slight factual variations.

*Colon v. Aponte Roque*, 848 F.2d 331, 333 & n. 2 (1st Cir.1988).

---

**8.** We have treated outright demotions, which involve reductions in pay and official rank, as equivalent to discharges. *See, e.g., Gierbolini*

1. An employee who has lost merely the "perks" of his position—for example, the best office or secretary in the agency, unlimited telephone access or unusually minimal oversight—would not meet the "unreasonably inferior" standard.

2. An employee whose job has been substantially narrowed—perhaps reduced from manager of five departments to two—but who retains supervisory authority over matters of comparable significance to those taken away would not meet the "unreasonably inferior" standard.

3. An employee who previously had predominantly exciting and responsible work and who was left with only a few routine and technical assignments could be found to meet the standard so long as his prior duties reflected the usual nature of his position rather than his prior high status as a member of the then-prevailing party. For example, if an assistant to the director of an agency typically has no supervisory authority, but the potential plaintiff who is in that job had supervisory status under the last director *because he was a political ally of that director* or because he had some other idiosyncratic *nonpolitical* relationship (say, friendship or "golfing buddy" status) with his superior, a reduction of the employee's role to the norm would not give rise to a violation. On the other hand, if the assistant to the director traditionally has run the office in the director's absence, and the new director now assigns this task—and others of responsibility—to someone who is the plaintiff's subordinate, a factfinder would be entitled to term the new job conditions "unreasonably inferior."

4. An employee whose job functions remain largely the same, but who is excluded from policymaking sessions that he or she once attended would not meet the "reasonably inferior" standard. Such a person, whose duties are not politically sensitive enough to allow a patronage dismissal, may nevertheless as a party confidante have been invited to contribute ideas and advice to those in poli-cymaking positions. The new administration need not extend similar invitations to those who do not share its political outlook.

5. An employee who had been a supervisor and had worked independently in designing the projects necessary to carry out her duties and who lost only the freedom to work independently—instead being required to report regularly on her work—would not meet the standard. Similarly, if the employee lost her supervisory role but continued to work independently on projects of significance, she would be unlikely to meet the standard unless the supervisory part of her job had been its defining characteristic.

If, however, that same employee lost both her supervisory status and her independence, in all likelihood the factfinder would be entitled to conclude that she met the standard. The decision would turn, however, on such factors as whether the supervisory role had been a primary part of her job, whether the duties she retained were challenging and significant, and whether new and inferior working conditions accompanied the change in duties (e.g., lost access to telephone and photocopier, poorer office accoutrements, worse hours).

6. An employee who is given one or two short-term assignments that are below his rank probably would not meet the standard of severity. In general, an employee must show a permanent, or at least sustained, worsening of conditions to reach the threshold of constitutional injury. If, however, a temporary change in duties is so inappropriate as to be demeaning and persists for longer than a week or two, the severity threshhold might be met.

7. An employee who retains her job duties but who is criticized harshly and on a nearly daily basis, never provided guidance on how to improve, transferred to an undesirable office space (e.g., without ventilation or in a distant location from the remainder of the office staff), and whose requests for assistance are spurned would meet the severity level.

Our standard incorporates not only the substantive "unreasonably inferior" criterion as we have attempted to define and illustrate it, but also the procedural requirement that a plaintiff establish a change in conditions sufficiently severe to meet this high standard by clear and convincing evidence. We do not subject proof of an employer's political motivation to this more rigorous burden requirement because we feel that political animus too often would be difficult to identify by proof beyond a preponderance. Setting a more demanding requirement for the political motive requirement would, we feel, impermissibly chill this kind of First Amendment right of an individual. But proof of changed conditions is not so subject to camouflage, and requiring that it be established beyond a slight tilt in the believed testimony seems to us consistent with the First Amendment interest of the governmental employer. *See Addington v. Texas*, 441 U.S. 418, 424, 99 S.Ct. 1804, 1808, 60 L.Ed.2d 323 (1979) ("clear and convincing" standard has been used to protect notably important interests in civil cases). *See also Anderson v. Cryovac, Inc.*, 862 F.2d 910, 925–26 (1st Cir.1988) (adopting "clear and convincing" standard for proof that wrongfully concealed evidence was inconsequential).

While recognizing the risk of too narrowly describing the task at hand, we suggest that the factfinder's responsibility, in brief, is to determine whether the employee has retained duties, perquisites and a working environment appropriate for his or her rank and title. In some instances, the factfinder will be able to look primarily at the history of the job at issue to determine whether the employee's new role is unreasonably inferior to what the job is supposed to be. In other cases, however, there may be no stable prior job history to serve as a standard, and the factfinder will be able to examine only the change in the particular employee's working conditions to determine whether the "new" job is unreasonably inferior to the one she previously had. In every case, the burden will be on the employee to establish this fact through clear and convincing evidence.

### D.

The case is not over, of course, even when a factfinder determines that the harm suffered by an employee is sufficiently severe to meet our standard. The employee still must persuade the factfinder by a preponderance of the evidence that the diminution in duties was motivated by discrimination on the basis of political affiliation.[9] Under the formula used in political discharge cases, an employer then may seek to establish by a preponderance of the evidence that the changes would have been made *regardless of* political affiliation. *See Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *Cordero v. DeJesus Mendez*, 867 F.2d 1, 5 (1st Cir. 1989); *Kercado Melendez v. Aponte Roque*, 829 F.2d 255, 264 (1st Cir.1987). Examples of such defenses would be a showing that plaintiff's performance had been so unsatisfactory that assignment to less demanding duties was indicated, a showing that elimination of an employee's most important projects resulted primarily from unavoidable budget cuts, or a showing that *most* employees within the relevant unit, regardless of political affiliation, experienced a reduction in duties as part of a personnel expansion and reallocation of responsibilities.

One defense available to the government deserves more sustained attention. This is what we shall call the "changeover" defense. It refers to a new administration's claim that challenged actions taken reasonably soon after the "changeover" in power were designed to advance its First Amendment-related interest in implementing its policies. This de-

---

9. The question of political motivation could be resolved before the issue of the severity of the harm. For example, in instances in which discovery shows that the defendants' actions obviously were motivated by lawful concerns, it is likely that a district court faced with a defense motion for summary judgment would choose to dispose of the case on that ground rather than to delve into the facts concerning the change in duties.

fense has two aspects. The first recognizes the obvious fact of life that many changes in government can be expected early in a new administration's tenure. In order to best accomplish its policy goals, a new administration may substantially reorganize the structure of one or more departments, it may readjust departmental priorities, or it may initiate entirely new procedures for carrying out its functions. The changeover in government is thus likely to produce substantial alterations in certain employee's jobs not because those employees are members of the outgoing party but because the incoming party, *as a matter of policy*, does not view those jobs to be important. We believe an incoming administration must be given ample room to effect this sort of change without the fear of triggering a multitude of lawsuits by employees whose jobs have changed. Therefore, we believe the factfinder should give some deference to a new government's explanation of how changes made shortly after it assumed power fit into its overall policy objectives. The government would retain the burden of proof on this issue, although its burden would be lightened by the deference given to it.[10]

The second aspect of the "changeover defense" is more sensitive because it requires a modification of the traditional *Mt. Healthy* formula. Rather than requiring the government to state non-political reasons for its actions, this prong assumes that the new administration may, at times, feel the need to assign duties deemed especially critical to its political philosophy to employees who share that philosophy. Such employees may be members of the administration's own party. This shift in duties *based on* political affiliation could be proper where the employer can show a reasonable basis for believing that such an employee would likely be more helpful in implementing the new policies than an employee who is a member of an opposing political party. Although in such cases we are assuming that the cumulative duties of the employee who lost responsibility do not fit the *Elrod–Branti* exceptions, and that the employee therefore would be protected from political *discharge*, it may be that he is not protected from losing *certain* job duties that are politically sensitive within the new administration's framework for government. On this prong, as well, the factfinder should give some deference to the government's explanation of its needs.[11]

█ Deference to the government's explanation of its actions does not mean abdicating the responsibility to determine whether the new administration's changes were in fact made to further the effective implementation of its policies. A plaintiff always must be given the opportunity to demonstrate that the government's asserted justification is simply a pretext. In evaluating the changeover defense, the factfinder should take into account, *inter alia*, whether the actions occurred precipitately or after some opportunity for ap-

---

10. We add this important caveat: an administration ought not to be deprived of a "reorganization" defense simply because it took place at a relatively late point in its term of office. Some reforms and reorganizations may be much more complex than others and require much more investigation, analysis and preparatory drafting. And some ideas for restructuring may simply have surfaced later in good faith. We see no need to give the government unusual deference when reviewing late-blooming changes. It should be easy enough for a new administration to defend legitimate reorganizations that come late in its term since such changes are more likely to be documented, and less likely to be politically motivated, than changes made when a new administration first comes to power.

11. A government defense based on policy needs presents another opportunity for ad hoc balancing. We could decide on a case-by-case basis whether the government's need to take an employee action based on political affiliation is outweighed by the burden on the employee. We again choose a formulaic approach: if the government demonstrates that there is some policy justification for internal reshuffling of duties, in view of its mandate as a democratically elected administration, we will refrain from any further balancing. This approach is consistent both with *Elrod* and *Branti* and with our view that governments must have some breathing room to make good on promises to the electorate. The employee, of course, must be given the opportunity to refute the government's assertion that policy concerns motivated the disputed action.

praisal,[12] whether they seem connected with previously announced goals, and whether they flowed from an organizational or procedural study. In cases implicating the second prong of the "changeover defense," the factfinder must look specifically at the duties in question to determine whether they concern politically sensitive matters.

Thus, drastic changes in job duties and conditions occurring early in the life of an administration may not be made entirely free of potential constitutional liability. Our policy of deference to the government's explanations, however, should allow officials to take *legitimate* actions toward implementing their policies without undue fear of liability. So long as the government is able to provide a substantive reason for its decision that is supported by the facts in the record, the government will be able to justify its actions with the changeover defense.[13]

### E.

We do not believe our standard will open the door to a flood of new lawsuits. The severity of the harm necessary to state a cause of action and the defenses available to government defendants should discourage those with petty complaints. Moreover, many cases may be ready for decision at the summary judgment stage since, in our view, conversations and exhibitions of

attitude are far less relevant than evidence as to working conditions and responsibilities. Judges should encourage the submission of sufficient documentation to enable such a resolution to be made as early and as often as possible. And to the extent that litigants or their lawyers make conclusory claims without "reasonable inquiry" to assure that claims are "well grounded in fact" and "warranted by ... law," Fed.R. Civ.P. 11, the district courts have ample power to forestall abuses. *See id. See generally Muthig v. Brant Point Nantucket, Inc.*, 838 F.2d 600 (1st Cir.1988).

Finally, although district court findings of fact will stand unless clearly erroneous,[14] their measurement against the general standards we have set forth will be reviewed by us as a question of law: whether the politically motivated change in an employee's work conditions imposes a substantial burden on the employee's right to free association that is not outweighed by the government's interest in implementing effectively its policies. Our own effort will be directed at striking a balance which will be sensitive to both the rights of civil servants to their political beliefs and associations and to the rights of administrations in power to effectuate their perceived mandates from the electorate. We shall also remain keenly sensitive to the danger that courts be seized upon as arbiters of petty grievances. We recognize the existence of a vast mine field and the possibility that

12. For example, changes made within days of a new administration's ascent to power ordinarily would be more likely to reflect an improper political housecleaning than would changes made months later, after the new officials have had a chance to evaluate how to reorganize their departments to best meet their policy goals.

13. In suggesting some deference to a new administration's explanation of how its program was aided by the changes it made shortly after assuming power, we do not mean to set out a fixed criterion for every case. What we face in the instant case and its companion is a restructuring of important jobs and reassignment of duties to political confidants, the kind of action frequently sought to be justified on policy grounds, particularly right after a new government assumes power. We do not consider here decisions with a more individualized impact—decisions in which the policy justification is

more difficult to perceive because the adverse action against a political opponent takes place with no discernible parallel change in favor of a political colleague. Such actions could include a transfer to a distant state, *Delong v. United States*, 621 F.2d 618 (4th Cir.1980) or a denial of a scheduled promotion or salary increase, *Robb v. City of Philadelphia*, 733 F.2d 286 (3d Cir. 1984); *Allaire v. Rogers*, 658 F.2d 1055 (5th Cir.1981); *Bickel v. Burkhart*, 632 F.2d 1251 (5th Cir.1980). Such decisions arguably present such a divergence from normal administrative practice that assertions of policy justification warrant particular skepticism rather than deference. We express no views on such cases at this time.

14. We reject defendants' urging that we review the facts de novo as in cases involving free speech. *See Figueroa v. Aponte Roque*, 864 F.2d 947, 949 n. 3 (1st Cir.1989).

subsequent clearer perception of the hazards may well cause us to refine or change our standards.

### III. *Application of Standard*

We conclude that the district court should have the opportunity in the first instance to evaluate the plaintiffs' complaints in light of the standard we announce today. That court may feel able to make judgments based on the evidence it has heard already, or it may choose to hear additional evidence on factors the parties did not previously deem relevant in determining whether an individual has been subjected to unreasonably inferior working conditions. For example, the parties may not have developed evidence concerning the duties and perquisites appropriate for a given position, instead directing their energies toward showing the differences between an employee's old job duties and the new ones. These two inquiries may not lead to the same result.

We therefore remand these cases so that the district court may reconsider its judgments in light of the standard we have developed for identifying a violation of a government employee's constitutional right of free political association. Our disposition makes it unnecessary to consider at this time the other issues raised by the parties.

*The judgments of the district court are vacated, and the cases are remanded for further proceedings consistent with this opinion.*

---

LEVIN H. CAMPBELL, Chief Judge (concurring).

I join in Judge Coffin's opinion because his analysis seems the most consistent with what the Supreme Court has said to date. The Court will soon, however, be studying for the first time the very sort of matter now before us, *see Rutan v. Republican Party of Illinois*, 868 F.2d 943, 949–51 (7th Cir.1989) (en banc), *cert. granted,* — U.S. ——, 110 S.Ct. 48, 107 L.Ed.2d 17 (1989); and I hope that, upon further analysis, the Court will decide *against* allowing state employees to sue for job changes that fall short of actual or constructive discharges.

Judge Breyer has brilliantly highlighted the dangers of our present position. Whatever good may occasionally result from allowing recovery for deprivation of job responsibilities and perks, is outweighed by the pressures the existence of such an action will impose upon the government. The threat of such lawsuits could deter administrators from making needed reorganizations and personnel shifts.

Judge Coffin does as well as can be done in setting out criteria to separate meritorious from spurious claims. But the intricacy of the necessary analysis makes it difficult to predict outcomes. Many situations will involve uncertainty until resolved in court. The only sure way for an administrator to avoid liability will be to avoid changing the status quo. Thus the voters' mandate for change may go unheeded. In my view, the Constitution should never be read as providing for this kind of relief.

*Torres–Hernandez* exemplifies a scenario to be expected in many of these cases. I completely share Judge Breyer's disbelief that recovery is a serious possibility here. Nonetheless, for the time being, I join my colleagues in vacating and remanding, thus leaving that case alive for the moment at least. I do so solely in the interests of uniformity and because I hesitate to cut plaintiff off until the Supreme Court has had time to establish the ultimate standard.

---

BREYER, Circuit Judge (concurring and dissenting).

### I.

#### *Concurrence*

The majority holds that the First Amendment, as interpreted by the Supreme Court in *Elrod* and *Branti*, protects a government employee (in a "nonpolitical" position) from demotion to an "unreasonably inferior" work status because of membership in a particular political party. I concur in this holding. The *Elrod/Branti* text that the majority quotes, see pp. 1214–15, *supra*, indicates that the opinions' rationale is not limited to discharges; and, it is difficult to

see how the First Amendment can prohibit politically motivated discharge, yet not prohibit politically motivated demotions or other personnel actions that are often just as serious. Thus I cannot say the majority's reading of *Elrod* and *Branti* is wrong.

Moreover, the majority's opinion fully recognizes that "political retaliation" cases, such as those before us, embody not one, but two sets of potentially conflicting interests. On the one hand, the First Amendment protects a government employee's association with others in a political party. On the other hand, a major reason the Constitution protects associational interests is so that individuals can join together in working to elect a government that will create practical programs of administration to carry out the policies they advocate. Thus when courts apply the First Amendment to protect political associational interests of government employees, they must recognize *not only* that the lack of *any* protection can open the door to unwarranted, politically based victimization, but also that too much judicial intervention may unjustifiably interfere with the electorate's ability to see its political aims translated into action.

The majority has made a fine effort to reconcile these competing interests. On the one hand, it permits suits designed to show a serious, politically motivated "demotion." On the other, it seeks to prevent juries from simply supplanting civil service commissions—by insisting that the relevant harm be severe, that it be shown by clear and convincing evidence, and that it correspond roughly to the types of significant harm that the court illustrates with examples. To maintain adequate flexibility for an administration, particularly a new administration, to implement new policies, the court constructs the "changeover" defenses, and creates rules of "deference" for the factfinder, whether judge or jury. In short, the judicial machinery is carefully calibrated to meet competing constitutional needs.

Yet, I must confess to doubts. For one thing, will these standards prove sufficient to protect the administrative (and, ultimately, the electorally-based, democratic) need for flexibility? Suppose, as in 1971, a new Federal Trade Commission chairman wished to reinvigorate a moribund agency. Suppose the new chief wished to change the responsibilities of top-level civil servants, bringing those more likely sympathetic to new policies closer to the center of power. Further, suppose that a higher percentage of those persons whom he wished to entrust with increased responsibility, persons whom he believed more sympathetic to his policies, belonged to the newly elected political party. Will not many of those replaced find that their job responsibilities have "been substantially narrowed," leaving them without "supervisory authority over matters of comparable significance," p. 1219, *supra,* or that their (nonpolitical) jobs, which previously embodied "exciting and responsible work," now involve "only a few routine and technical assignments?" *Id.* Will it be possible to *prove in court* that the new, replacement group of "top lieutenants" is more capable than the old? Might not the new chief have based changes in responsibility in part upon what he has heard informally, or even sensed, including matters which (because they are impressionistic or even derogatory) other administrators cannot or will not testify about in a court? *Compare* American Bar Association, *Report of the Commission to Study the Federal Trade Commission* (1969) (detailing need for revitalization at FTC) *with* President's Advisory Council on Executive Organization, *A New Regulatory Framework: Report on Selected Independent Regulatory Agencies* ("The Ash Report") (1971) (advocating restructuring of responsibilities to centralize authority in independent agencies).

Of course, the majority has dealt with this problem by allowing the government to defend against a charge of politically motivated acts by demonstrating that the changes were part of a policy initiative, and the majority insists that judge or jury "defer" to that determination. Yet, a plaintiff (a Republican when Democrats are in power, or vice versa) will still win unless "an employer can *show* a reasonable basis for believing that ... [the employee to whom

plaintiff's responsibilities were shifted] is more likely to help implement the new policies than an employee who is a member of an opposing political party." P. 1221, *supra* (emphasis added). Can a department chief *know* what he will, or will not, be able to *show* (to "establish by a preponderance of the evidence") at some future time *in court*, before a jury, rather than before a more expert civil service board? Without such knowledge, can he act boldly enough to translate the will of an electing majority into workable policy? Will politically appointed department heads, without such knowledge, and fearing damage judgments after court battles, tend to follow the path of least resistance, namely, the status quo? Will the inevitable, serious, and unknown risk of liability contribute to bureaucratic inertia? At a minimum, a new official trying to implement new policies will have to document his reasons for each change of administrative responsibilities and employee transfer, thereby transforming fairly routine administrative changes into changes that the Constitution permits only for "cause," with an accompanying need for legal documentation of that "cause."

For another thing, despite the majority's standards, it may prove difficult to prevent the courts from being swamped with a vast number of plaintiffs complaining of the sorts of personnel actions that a civil service board can more properly and more fairly decide. (For examples of administrative grievance procedures already in place, see 5 U.S.C. § 1206 (authorizing and directing the Special Counsel of the federal Merit Systems Protection Board ("MSPB") to investigate prohibited personnel practices on request); 5 U.S.C. §§ 7512, 7513(b)–(d), 7701(a), 7702, 7703(a) (1982), § 7543 (1982 & Supp. II 1984) (providing, for all significant adverse actions taken against civil servants, agency notice, hearing or opportunity to answer, appeal to the MSPB, review by the Equal Employment Opportunity Commission in cases involving alleged discrimination, and judicial review of MSPB decisions); P.R.Laws Ann. tit. 3, §§ 1301–1431 (1978 & Supp.1986) (detailing protections against improper employment practices under the Puerto Rico Public Service Personnel Act).) We know that when the governorship of Puerto Rico changed hands in 1984, about 300 plaintiffs who lost their jobs brought suit, out of about 600 in "trust" or "confidence" positions who were dismissed, in turn out of about 3,700 civil servants who were employed in "trust" or "confidence" positions in a civil service of about 160,000. *See Juarbe Angueira v. Arias,* 831 F.2d 11, 14 (1st Cir.1987). Our decision today opens the door of the federal courts to all those in the civil service, including those towards the bottom of this vast pyramid, who might claim that a significantly adverse personnel action rested on political motives. My experience with those of the 300 "dismissal" cases that have reached this court leaves me uncertain of the abilities of the federal courts, insulated from the political process, to determine which specific jobs in fact are politically sensitive (let alone which "job duties" are "politically sensitive," *see* p. 1221, *supra* ); and, it has made me aware of the concomitant risk of constitutionally freezing into permanent place the civil service structure of the moment.

Despite these doubts, I join the majority opinion, because *Elrod* and *Branti*, in my view, mandate the majority's result. At the same time, these doubts prevent me from joining in the disposition of *Torres Hernandez v. Padilla.*

## II.

### *Dissent: Torres Hernandez*

A reading of the record in *Torres Hernandez,* disbelieving all defense witnesses and believing all that plaintiff says, leads me to conclude that the most that plaintiff could show is the following:

a. In 1981, the Mayor (PDP) faced a Municipal Assembly dominated by the other party (NPP). He knew that the plaintiff was an NPP activist. He was having great difficulty dealing with the Assembly.

b. In March 1981, the Mayor found out that the plaintiff, his chief personnel officer, was having lunch at the City Hall with Municipal Assembly officials, in-

cluding the Secretary of the Assembly. He told her not to do so.

c. In April 1981, the Mayor met with plaintiff and (in her words) "indicated to [her] that he was tired, that he was fed up with both the PDP and the NPP." Plaintiff added:

In that conversation, or at that meeting that the Mayor and I had in private, and with Your Honor's permission I'm going to use an improper word, he said to me, "Maria Teresa, I'm going to tell you something David [an NPP member] told me: a leader of the Popular Democratic Party, that is himself, is a fool, a sucker, because he thinks Maria Teresa is Popular and Maria Teresa is one of ours."

d. In July 1981 (and again in March 1982), the Mayor was having a hard time getting his budget passed. He again asked plaintiff not to make regular visits to his political opponents at the Municipal Assembly. He seemed angry.

e. At some point, two "irregular" (positions outside of the permanent civil service classification system) employees in plaintiff's division were dismissed; another (who, according to plaintiff, did not like to work Mondays or Fridays) was transferred. All were members of the NPP. Two others were retained; one of these was PDP, one was NPP. Three others were hired; the record does not show their party affiliation.

f. In February 1983 (*one and one-half years later*), the Mayor hired a special assistant who bossed plaintiff around, gave her a smaller desk, and told her to work on file updating.

g. In May 1983, the Mayor wouldn't let plaintiff go on a planned vacation. He gave as an excuse that she was needed because her assistant was sick. The assistant did not seem very sick. Plaintiff had a nervous breakdown and left work.

h. In January 1984, after recovering from the breakdown, plaintiff returned to work and asked for a relocation (on advice from her doctors). The Mayor sent her to the Health Department where she was given (arguably) menial work, but continued to be paid the same salary she had as a personnel officer. She must have been satisfied, for she has complained, not about this job, but about being transferred back to her old job.

i. She ran into the Mayor one day. He seemed cold and distant. This scared her.

j. In March 1984, the Mayor ordered her back to her old job. He berated her, apparently because her plan to get him a larger payroll check by lowering his payroll retirement deduction backfired, leaving him with a demand for money from the retirement commission. (Could this be why he was a little cold and distant?) Plaintiff had another breakdown.

I would include, as an illustration of circumstances in which a plaintiff can *not* prevail, the very facts of this case. I would hold that plaintiff has not made out a case of unlawful politically motivated demotion. She fails because the bulk of the evidence she relies upon to prove "political motivation," namely, her lunchtime meetings with NPP officials, are, at best, ambiguous in respect to whether (given the circumstance of her working relationship with the mayor) they constitute activity that the Constitution protects.

To permit a finding of liability and assessment of damages on the basis of these facts would suggest, for example, that a mayor of Chicago could not forbid his personnel officer to hold lunchtime meetings with opposition city council members. It would suggest that the head of the federal Office of Management and Budget, during a time of budget crisis, could not try to control meetings between his top civil servants and the Speaker of the House of Representatives (or his staff). Such a finding would place serious, if not insurmountable, obstacles before a mayor who wishes to run his own personnel office and to overrule a civil servant whom he sees as an obstacle, or who hires a non-civil service staff assistant to help him to supervise the running of the office. It would mean that a mayor must either give full personnel responsibilities to a person he sees as a political activist meeting regularly with his

political enemies or build a documented case that will show by a "preponderance of the evidence" in court that there is "cause" for transfer. Indeed, since the only other evidence of political favoritism in this case consists of the fact that the Mayor *also* dismissed three other employees who were members of the NPP, two of whom held "irregular" positions, the decision also requires the Mayor to document reasons for these decisions (even if those dismissed see no problem), thereby transforming low-ranking irregular jobs into a form of tenured employment. If liability were assessed in this case, the only safe course of action for a newly elected mayor would be to change as few responsibilities as possible, to work with the inherited administrative structures, to accept the most serious limitations on his ability to bring about change. That is why I think the conduct at issue in this particular case is properly governed by civil service rules, not the Constitution of the United States.

For these reasons, while I join the opinion of the majority, I would not remand the case of *Torres Hernandez v. Padilla* for reconsideration.

TORRUELLA, Circuit Judge (dissenting).

Someone once said that a camel is a horse that was designed by a committee, an observation of particular relevance to *en banc* opinions. *See United States v. M/V BIG SAM*, 693 F.2d 451, 456 (5th Cir.1982) (Gee, J., dissenting). The present case is no exception. For the sake of reaching a consensus, the majority compromises principle and further clouds the law in this fundamental area of First Amendment

rights. That is too high a price to pay for collegiality.

The majority concludes that some politically discriminatory personnel actions against public employees short of dismissal may constitute a violation of the employee's associational rights under the First Amendment, and thus actionable pursuant to 42 U.S.C. § 1983. This result is hardly remarkable, although the restrictions placed upon this holding by the majority are. This conclusion, minus these severe restrictions, was the same one reached by the panels in both of these appeals back in 1987,[1] as well as that of other circuits since.[2] *E.g., Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir.1989), *reh'g denied*, 1989 WL 56224, 1989 U.S.App. Lexis 10065; *Lieberman v. Reisman*, 857 F.2d 896, 900 (2d Cir.1988); *Bennis v. Gable*, 823 F.2d 723, 731 (3d Cir.1987). *See also* Note, *First Amendment Limitation on Patronage Employment Practices*, 49 U.Chi.L. Rev. 181 (1982); Note, *Republicans Only Need Apply; Patronage Hiring and the First Amendment in Avery v. Jennings*, 71 Minn.L.Rev. 1374 (1987). *Contra, Rutan v. Republican Party of Illinois, supra; Delong v. United States*, 621 F.2d 618, 623–24 (4th Cir.1980).

What is remarkable is the myopic reluctance of this Court to fully recognize the associational rights of public employees in non-discharge personnel situations, given the overwhelming evidence that this result is mandated by *Branti v. Finkel*, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), and *Elrod v. Burns*, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976). This reluctance is evidenced not only by the unusual

1. *See Torres Hernández v. Padilla*, Nos. 86–1643, 86–1644 (1st Cir. June 22, 1987); *Agosto de Feliciano v. Aponte Roque*, No. 86–1300 (1st Cir. Aug. 14, 1987).

2. It should also be noted that many courts have applied this principle to the issue of patronage hiring as well. *See Mazus v. Dep't of Trans.*, 629 F.2d 870, 873 (3d Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981); *Rosenthal v. Rizzo*, 555 F.2d 390, 392 (3d Cir. 1977), *cert. denied*, 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977); *Indiana State Employees Ass'n v. Indiana Republican State Cent. Comm.*, 630 F.Supp. 1194, 1196 (S.D.Ind.1986); *Torres v.*

*Grunkmeyer*, 601 F.Supp. 1043, 1047 (D.Wyo. 1984); *Shakman v. Democratic Org.*, 481 F.Supp. 1315, 1327 and n. 8, 1328 (N.D.Ill.1979); *McKenna v. Fargo*, 451 F.Supp. 1355, 1357 (D.N. J.1978), *aff'd*, 601 F.2d 575 (1979). *See also* Comment, *Patronage and the First Amendment After Elrod v. Burns*, 78 Colum.L.Rev. 468, 475–76 (1978); Comment, *Political Patronage In Public Contracting*, 51 U.Chi.L.Rev. 518, 527–28 n. 58 (1984). *Contra Rutan v. Republican Party of Illinois*, 868 F.2d 943, 949–51 (7th Cir.1989) (en banc), *cert. granted*, —— U.S. ——, 110 S.Ct. 48, 107 L.Ed.2d 17 (1989).

amount of foot dragging that has preceded reaching a consensus on an issue of minimal complexity, but more pointedly, by the timbre of the majority's opinion. That opinion, which in places more resembles a defense litigation manual than an Article III court decision, throws to the wind all notions of case and controversy resolution. *See ante* at 1218–20. Reluctance is also manifested by the unprecedented number and nature of tailor-made stumbling blocks, incantated from thin air and placed in the path of civil rights litigants like a carefully laid legal mine field.

As if those chilling processes were not enough, in the questionable interest of keeping this Court's docket within acceptable levels, *ante* at 1222, the majority concludes its arctic discourse by unwarrantedly invoking rules of sanction and review which will undoubtedly intimidate both the bar and the bench. *See ante* at 1222–23. All of this is secondary, however, to the fact that the standards created are confusing, unworkable and constitutionally flawed.

As linchpin for its rationale, the majority starts by telling us that "the difficulties facing courts in cases involving [public] employer action less final and definitive than dismissal are potentially enormous." *Ante* at 1214. This is, of course, totally irrelevant, but even if it were material, it is not any more difficult, tedious or complex to resolve these political harassment cases than the myriad of other issues routinely decided by courts, particularly in the area of employment practices. Deciding such issues is the daily bread and butter of district and appellate courts. *See Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989). Each

day federal courts "sift out the chaff of minor irritants and frustration from the wheat of truly significant adverse actions," *ante* at 1214, in cases involving private employers accused of engaging in discriminatory or harassing actions short of discharge, in scenarios in which the alleged animus is race [3], age,[4] gender,[5] or grounded on anti-union motivation.[6] Despite the application of these laws to private employers and "the difficulties facing courts" in deciding what is discriminatory or harassing in those situations, private enterprise generally survives, and still manages to pass, with some moderate degree of success, the ultimate litmus test of efficiency: turning a profit. Why should not the *public* employer be held to similar standards as the private employer, particularly when dealing with the protection of core First Amendment rights? The protestation of the majority, that only restrictive application of § 1983 will allow the governmental employer to operate efficiently, is contrary to the above cited experience in private industry, and for that matter, in the public sector as well wherein numerous restrictions on discrimination and harassment short of discharge are applicable to public employers.[7]

The argument that such restrictions on governmental action somehow nullify the democratic majority vote is equally spurious. The First Amendment, like most of the Bill of Rights, exists to protect minorities from abuses of the majority even when constituted in a democratically elected government. Winning an election is not a license to commit First Amendment abuses. *See Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287; *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673.

As is the case with other standards promoted by this court in the field of political

---

**3.** 42 U.S.C. § 2000e *et seq.; Falcon v. General Tel. Co. of Southwest,* 626 F.2d 369 (5th Cir.), *reh'g denied,* 631 F.2d 732 (1980).

**4.** 29 U.S.C. § 626(e)(1); *E.E.O.C. v. Air Line Pilots Ass'n Int'l,* 661 F.2d 90 (8th Cir.1981).

**5.** 42 U.S.C. § 2000e *et seq.; Price Waterhouse v. Hopkins,* —— U.S. ——, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989); *Kunda v. Muhlenberg College,* 621 F.2d 532 (3d Cir.1980).

**6.** 29 U.S.C. § 158(a)(1); *NLRB v. St. Regis Paper Co.,* 674 F.2d 104 (1st Cir.1982).

**7.** *See, e.g., Limongelli v. Postmaster General of the United States,* 707 F.2d 368 (9th Cir.1983) (age discrimination); *Cartagena v. Secretary of the Navy,* 618 F.2d 130 (1st Cir.1980) (race discrimination); *Sweeney v. Bd. of Trustees of Keene State College,* 604 F.2d 106 (1st Cir.1979) (gender discrimination), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980).

discrimination,[8] the so-called "categorical approach" promoted by the majority establishes a non-standard which is biased in favor of the public employer. The emphasis is in the wrong place. This court appears to be more concerned with "harassing lawsuits," *ante* at 1217, than with harassed employees. Furthermore, in establishing a "clear and convincing evidence" standard for plaintiffs to prove "unreasonably inferior" changes in conditions sufficient to find a violation of § 1983, the court engages in action tantamount to judicially amending this legislation. I am unaware of, nor does the majority cite, any case litigated pursuant to § 1983 in which a standard of proof higher than that required in all civil suits (*i.e.*, proof beyond a preponderance of the evidence) has been exacted. *Cf. Price Waterhouse v. Hopkins*, 109 S.Ct. 1775.

Neither case relied on by the majority, *Addington v. Texas*, 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), nor *Anderson v. Cryovac, Inc.*, 862 F.2d 910 (1st Cir. 1988), involved civil rights litigation. Their holdings are completely irrelevant to the present controversy. *Addington* concerns the standard of proof for civil commitment which, because the end result is akin to criminal imprisonment, requires a higher standard of proof than in an ordinary civil case. *Anderson* is equally inapposite. It involves the presumption raised against a party who destroys, the contents of documents which affect that party. Moreover, in *Price Waterhouse v. Hopkins*, a Title VII case, the Court said as follows:

> Conventional rules of civil litigation generally apply in Title VII cases, *see, e.g., United States Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983) (discrimination not to be "treat[ed] ... differently from other ultimate questions of fact"), and one of these rules is that parties to civil litigation need only prove their case by a preponderance of the evidence. *See, e.g., Herman & Mac-*

*Lean v. Huddleston*, 459 U.S. 375, 390, 103 S.Ct. 683, 691, 74 L.Ed.2d 548 (1983). Exceptions to this standard are uncommon, and in fact are ordinarily recognized only when the government seeks to take unusual coercive action—action more dramatic than entering an award of money damages or other conventional relief—against an individual. *See Santosky v. Kramer*, 455 U.S. 745, 756, 102 S.Ct. 1388, 1396, 71 L.Ed.2d 599 (1982) (termination of parental rights); *Addington v. Texas*, 441 U.S. 418, 427, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323 (1979) (involuntary commitment); *Woodby v. INS*, 385 U.S. 276, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966) (deportation); *Schneiderman v. United States*, 320 U.S. 118, 122, 125, 63 S.Ct. 1333, 1335, 1336, 87 L.Ed. 1796 (1943) (denaturalization). Only rarely have we required clear and convincing proof where the action defended against seeks only conventional relief, *see, e.g., Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342, 94 S.Ct. 2997, 3008, 41 L.Ed.2d 789 (1974) (defamation)....

   .    .    .    .    .

Significantly, the cases from this Court that most resemble this one, *Mt. Healthy* and *Transportation Management*, did not require clear and convincing proof. *Mt. Healthy*, 429 U.S., at 287, 97 S.Ct., at 576; [*N.L.R.B. v. Transportation Management*, 462 U.S. [393] at 400, 403, 103 S.Ct. [2469] at 2473, 2475 [76 L.Ed.2d 667 (1983) ]. We are not inclined to say that the public policy against firing employees because they spoke out on issues of public concern or because they affiliated with a union is less important than the policy against discharging employees on the basis of their gender. Each of these policies is vitally important, and each is adequately served by requiring proof by a preponderance of the evidence.

*Price Waterhouse v. Hopkins*, 109 S.Ct. 1792–93. In a century of civil rights litiga-

---

**8.** *See, e.g., Figueroa Rodriguez v. Aquino*, 863 F.2d 1037, 1048–49 (1st Cir.1988) (Torruella, J., dissenting).

tion no court has ever proposed the barriers that the majority is today establishing.

But the majority is still not satisfied. Instead, it goes further and adds a new weapon to the public employer's arsenal, the so-called "changeover" defense. This defense "refers to a new administration's claim that challenged actions taken reasonably soon after the 'changeover' in power were designed to advance its First Amendment-related interest in implementing its policies." *Ante* at 1220. The majority justifies this new defense on the grounds that "an incoming administration must be given ample room to effect this sort of change without the fear of triggering a multitude of lawsuits by employees whose jobs have changed." *Id.* Lest the government employer be too encumbered by the minor requirement that it carry the burden of proof on this issue, the majority obligingly lightens this burden "by the deference given to" the new administration's claim. *Id.* As expected when judicial alchemy is at work, the majority cites no authority for this new creation.

Lest we lose interest in this mode of creative thinking, our attention is called to an "important caveat." *Ante* at 1221 n. 10. "Reasonably soon" after the changeover does not necessarily mean what is says, as "an administration ought not to be deprived of a 'reorganization' defense simply because it took place at a relatively late point in its term of office." *Id.* But, we are told, "changes made within days of a new administration's ascent to power ordinarily would be more likely to reflect an improper political housecleaning." *Ante* at 1222 n. 12. So, we can say with some "confidence," that the "changeover" defense is available for changes that take place reasonably soon after the changeover in administration, which may mean anytime during the life of the administration, provided it is not too close to the changeover. It is hard to imagine how government has survived up to now without the benefit of such non-guidelines.

But the "changeover" defense has more to offer. It has a second prong. *Ante* at 1221. When faced with this defense, the public employee is caught in the prongs of a dilemma. The second prong skewers *Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). No longer will the government be required to state non-political reasons as the primary motivating factor in dual motive actions against employees, if the action is short of discharge. Employers will be allowed to assume that their politically copesetic subordinates will be more helpful in implementing new policies, *i.e.*, career governmental employees are not to be trusted to comply with their oath of office. As if this were not enough the factfinder must again give "deference" to the government's explanation of its needs in this respect. *Ante* at 1221. Again the majority gives no authority for these new standards but requires us to accept them on faith. There is a limit to everything, even faith, and to my view, such unsupported arguments cannot be acceptable when dealing with a subject matter as fundamental as the associational rights of public employees.

The decision reached by this Court today is most unfortunate. It emasculates and downgrades core rights protected by the First Amendment, effectively insulating that most insidious, and difficult to prove, governmental personnel practice: political harassment. It is an unwarranted boon to unscrupulous politicians who will most assuredly take, and use, all the advice which has so generously been given. The best that I can say about this decision is that it runs contrary to the remedial nature of the Civil Rights legislation in question. I dissent.