Thomas J. **CORRIGAN**

v.

**STATE OF RHODE ISLAND, DEPARTMENT OF BUSINESS REGULATION; Sheldon Whitehouse, in his official capacity as Director of the Department of Business Regulation of the State of Rhode Island; Robert J. Janes, individually; Anthony V. Arico, Jr., individually and in his official capacity as Deputy Director of the Department of Business Regulation; and Michael Fines, individually and in his official capacity as Associate Director and Superintendent of Securities of the Department of Regulation of the State of Rhode Island.**

Civ. A. No. 90–0648L.

United States District Court,
D. Rhode Island.

April 14, 1993.

**650**

Lynette Labinger, Providence, RI, for plaintiff.

Barbara Grady, Attorney General's Office, Providence, RI, for defendants.

Michael Sarli, Providence, RI, for defendant Janes.

### MEMORANDUM AND ORDER

LAGUEUX, Chief Judge.

This matter is before the Court on defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Defendants argue that the age discrimination and civil rights claims set forth by plaintiff, Richard D. Corrigan, either fail to state legally viable causes of action or are not supported by any facts or inferences in the record. Plaintiff, on the other hand, contends that all of the claims in the Complaint state valid causes of action and that he

has raised genuine issues of material facts regarding the claims.

## BACKGROUND

Plaintiff, who was born on September 21, 1940, worked for the State of Rhode Island Department of Business Regulation ("DBR") for over twenty years. In 1977, seven years after he began working for DBR, he became the Chief Securities Examiner in the Banking and Securities Division. His direct supervisor was the head of that division, the Associate Director and Superintendent of the Banking and Securities Division. Plaintiff remained Chief Securities Examiner until 1990 when he transferred to the recently created DBR Banking Division.

Importantly, during his tenure at DBR, plaintiff filed a number of complaints against the State of Rhode Island. In 1982, when he was 41 years old, plaintiff brought an action in federal court claiming that his nonselection for the then-vacant position of Chief Bank Examiner was a product of age discrimination. The State settled that suit with a cash payment. Subsequently, in 1985 and then again in 1988, plaintiff filed suits claiming that he was excluded from salary increases awarded to virtually all other employees within his division because of his age and in retaliation for his prior age discrimination actions. Again, these suits were settled. The final consent order, granting plaintiff a salary grade increase, was entered on January 19, 1989 when plaintiff was 48 years old.

The events leading to plaintiff's present suit began a few months later in 1989. At that time, DBR Director Robert Janes and Deputy Director Anthony Arico began implementing a change in DBR's structure that had been considered for a number of years. Specifically, they took steps to divide the Banking and Securities Division into two separate divisions, to place the Superintendent of the combined division in charge of the Banking Division, and to fill the new position of Associate Director and Superintendent of Securities with a lawyer.

After a Board of Bank Incorporators meeting in May 1989, Rhode Island Attorney General James O'Neil asked Janes to discuss job opportunities in Rhode Island with O'Neil's nephew, Michael Fines, a 33 year old lawyer working at the Securities Exchange Commission ("SEC") office in Boston. Later that month, Janes and Arico met with Fines. Thereafter, in July, Janes and Arico met with Governor Edward DiPrete's Chief of Staff, Arthur Markos, and advocated the creation of a separate Division of Securities to be headed by a lawyer. Janes identified Michael Fines as the candidate for the position. On July 20, the Governor adopted Executive Order No. 89–17 authorizing the creation of the position of Associate Director and Superintendent to head the Securities Division and to supervise the Chief Securities Examiner and the Securities Examiners.

The position vacancy was posted for applications within DBR for seven days in August 1989, but was not advertised in any newspaper or in any related enforcement agency, such as the SEC office in Boston or the National Association of Stock Dealers ("NASD") office. Janes personally notified Fines about the position. Fines and plaintiff were the only two applicants for the job. Arico interviewed both men and recommended Fines for the position. Janes agreed, and Fines soon accepted the job.

Fines began work in September 1989. Although prior to September plaintiff's responsibilities included reviewing subordinate staff work, assigning work to subordinates, and fielding telephone calls from attorneys throughout the country, plaintiff claims that Fines diverted all of these job duties to himself, leaving plaintiff with no work to perform. Plaintiff complained about the lack of work to both Arico and Janes, but, with the exception of a few low-level tasks assigned to him after he formally complained about the removal of all of his duties to the Equal Employment Opportunity Commission and the Rhode Island Human Rights Commission, he had no tasks to perform. At the direction of his doctor, plaintiff took sick leave five months after Fines began work. Following an informal reassignment, plaintiff returned in April 1990 to work in the Banking Division under the supervision of the Associate Director and Superintendent of Banking, Susan Hayes. He remained there

until he was placed on involuntary, indefinite layoff in March 1991.

Dissatisfied with his treatment at DBR, after completing the necessary administrative steps, plaintiff filed a Complaint in this Court seeking prospective injunctive relief, including being assigned as Associate Director and Superintendent of Securities, back pay, compensatory and punitive damages, and costs and attorneys' fees. The suit, which is based on federal question and pendent jurisdiction, contains six counts. The first three counts involve DBR's choice of Michael Fines, rather than plaintiff, for the position of Associate Director and Superintendent of Securities. The latter three parallel the first three in legal theory, but focus on the treatment of plaintiff from September 1989, when Fines began work, until plaintiff transferred to the Banking Division in April 1990.

More specifically, in Counts I and IV respectively, plaintiff alleges that the State, through Janes, Arico, and Fines, violated the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634 (1992), and its state counterpart, the Rhode Island Fair Employment Practices Act ("RI–FEPA"), R.I.Gen.Laws §§ 28–5–1 to 28–5–40 (1992), by failing to promote him and by subjecting him to a pattern of harassment because of his age and/or in retaliation for his prior age-related actions. The defendants in Count I are the State of Rhode Island, Department of Business Regulations (the "State") as well as Janes and Arico, in their individual capacities. In Count IV, plaintiff names these defendants plus Fines, individually.

In Counts II and V respectively, plaintiff alleges, under the Civil Rights Act of 1871, 42 U.S.C. § 1983 ("Section 1983"), that his First Amendment right to bring suit was violated by the decisions of the State, through Janes, Arico, and Fines, to not promote him and to strip him of all of his duties in retaliation for his past age-related suits. Finally, in Counts III and VI respectively, plaintiff alleges, again under Section 1983,

that his civil rights were violated by the decisions of the State, through Janes, Arico, and Fines, to not promote him and to eliminate all of his job responsibilities due to his lack of political sponsorship. In Counts II and III, plaintiff names Sheldon Whitehouse, current Director of DBR, and Arico, in their official capacities, plus Janes and Arico in their individual capacities as defendants; [1] he adds Fines, in both his official and individual capacities, to the list in Counts V and VI.

Defendants have responded both as a group and as individuals to these allegations. First they argue that plaintiff's claims are not supported by any facts or inferences in the record and that a number of the claims are not legally sound. Second, particular individual defendants contend that certain claims cannot be brought against them either because of a lack of factual support tying them to the alleged violation or because they are protected by the qualified immunity doctrine.

The Court heard oral arguments and then took this matter under advisement. Having reviewed the facts and analyses offered by each party, the Court is now prepared to grant defendants' motion for summary judgment.

## DISCUSSION

### I. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on a summary judgment motion:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

In determining whether summary adjudication is appropriate, the Court must view the facts on the record and all inferences therefrom in the light most favorable to the non-

---

1. Although, as stated here, plaintiff originally named Arico and Janes in their individual capacities as defendants in Count III of the Complaint, he has since conceded that these defendants have a valid qualified immunity defense to this Count.

moving party. *Continental Casualty Co. v. Canadian Universal Ins. Co.,* 924 F.2d 370, 373 (1st Cir.1991). At the summary judgment stage, the judge's function is not to weigh the evidence and determine the truth of the matter, but solely to decide whether there is a factual issue sufficiently sturdy for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). However, not every factual discrepancy pointed to by the nonmoving party precludes a summary judgment determination. The factual disagreement must be "genuine" and related to a "material" fact. In this context, a " 'material' fact is one 'that might affect the outcome of the suit under the governing law.' " *Rodriguez–Pinto v. Tirado–Delgado,* 982 F.2d 34, 38–39 (1st Cir. 1993) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510). Similarly, for an issue to be "genuine," evidence about the fact must be "such that a reasonable jury could resolve the point in favor of the nonmoving party." *Id.* at 38 (quoting *United States v. One Parcel of Real Property,* 960 F.2d 200, 204 (1st Cir.1992)). Thus, the nonmoving party cannot defeat summary judgment by relying on "conclusory allegations, improbable inferences, and unsupported speculation." *Pagano v. Frank,* 983 F.2d 343, 347 (1st Cir.1993) (quoting *Medina–Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir.1990)).

## II. Federal Age Discrimination Claims

Plaintiff asserts two counts under ADEA claiming that he was denied a promotion and subsequently was forced to endure unreasonable work conditions because of his age and/or his past age discrimination actions. Under this statute, plaintiff may sue his "employer" for certain adverse employment actions that were motivated by the employee's age or in retaliation for the employee's prior opposition to any employer practice on age-

related grounds.[2] Plaintiff seeks relief from the State of Rhode Island, DBR and individual defendants Janes and Arico as the offending "employers" in Count I and adds Fines, in his individual capacity, to the list in Count IV.

■ ADEA clearly allows claims against the State as "employer," however, individual state agents are not "employers" susceptible to suit. 29 U.S.C. § 630(b). Specifically, the statute defines "employer" as:

> a person engaged in an industry affecting commerce who has twenty or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year. . . . The term also means (1) any agent of such a person, and (2) a State or political subdivision of a State and any agency or instrumentality of a State or a political subdivision of a State, and any interstate agency, but such term does not include the United States, or a corporation wholly owned by the Government of the United States.

29 U.S.C. § 630(b). Thus, although the statute defines agents of commercial employers as "employers," the statute provides no such parallel for agents of States or other political employers. *See, e.g., Crommie v. California, Public Utilities Comm.,* 1993 WL 187719, *4, 1993 U.S.Dist. LEXIS 1495, *10 (N.D.Cal. 1993) ("Section 630's language suggests that agents of state agencies are not subject to suit under the ADEA, in contrast to agents of state agencies sued under Title VII"); *Tranello v. Frey,* 758 F.Supp. 841, 851–52 (W.D.N.Y.1991) (after analyzing statute's language and legislative history, Court concluded that individual state agents could not be employers under ADEA), *aff'd,* 962 F.2d 244 (2d Cir.), *cert. denied sub nom., County of Monroe v. Tranello,* —— U.S. ——, 113 S.Ct. 813, 121 L.Ed.2d 686 (1992); *Sagarino v.*

---

**2.** Regarding age discrimination, the ADEA specifically states:

> It shall be unlawful for an employer—
> (1) to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age. . . .

29 U.S.C. § 623(a). In regard to retaliation, the ADEA provides:

> It shall be unlawful for an employer to discriminate against any of his employees or applicants for employment . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d).

*Danvers,* 750 F.Supp. 51, 52 (D.Mass.1990) ("[T]his court agrees with the majority of courts that have considered this issue and holds that agents of a state or political subdivision of a state are not employers within the meaning of 29 U.S.C. § 630(b)"); *Ditch v. Bd. of County Comm'rs,* 650 F.Supp. 1245, 1251 (D.Kan.1986) ("It would have only required the insertion of the short phrase "and their agents" in 29 U.S.C. § 630(b)(2) to express Congress' intent to hold individuals such as these defendants liable for age discrimination"), *modified on other grounds,* 669 F.Supp. 1553 (D.Kan.1987). Therefore, no further inquiry is required to dismiss the ADEA counts against the individual defendants. However, as additional analysis is necessary to determine the fate of the ADEA claims against the State, the Court now turns to this task.

## A. General Overview of Claims

■ Ultimately, to succeed on these age related claims plaintiff must show that the adverse employment consequences he suffered are the types proscribed by the statute and that his years or past age discrimination claims were the "determinative factor" in his employer's adverse decisions. *Mesnick v. General Electric Co.,* 950 F.2d 816, 823 (1st Cir.1991) ("The plaintiff in an ADEA discrimination suit bears the ultimate 'burden of proving that his years were the determinative factor in his discharge, that is, that he would not have been fired but for his age' ") (quoting *Freeman v. Package Machinery Co.,* 865 F.2d 1331, 1335 (1st Cir.1988)), *cert. denied,* —— U.S. ——, 112 S.Ct. 2965, 119 L.Ed.2d 586 (1992). Plaintiff can satisfy the latter element by adducing direct evidence of discrimination, *see, e.g., Trans World Airlines v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985), or by presenting circumstantial evidence under the *McDonnell Douglas* burden-shifting formula. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973);[3] *see also, e.g., Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101

S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Lawrence v. Northrop Corp.,* 980 F.2d 66, 69 (1st Cir. 1992); *Loeb v. Textron, Inc.,* 600 F.2d 1003, 1015 (1st Cir.1979).

■ Under the *McDonnell Douglas* structure, a plaintiff can get his foot in the door by presenting a prima facie case. The prima facie case, which is aimed at substantially decreasing or even eliminating qualification as the reason for the adverse employment action, creates an initial inference that the employer was motivated by a discriminatory intent. *Cf. Burdine,* 450 U.S. at 253–54, 101 S.Ct. at 1094 ("The prima facie case serves an important function in the litigation: it eliminates the most common nondiscriminatory reasons for the plaintiff's rejection"). If plaintiff fails to produce either direct evidence of discriminatory intent or sufficiently sturdy evidence to support a prima facie case, a court must grant a defendant's motion for summary judgment. *Mesnick,* 950 F.2d at 824; *Gannon v. Narragansett Electric Co.,* 777 F.Supp. 167, 170 (D.R.I.1991). On the other hand, if plaintiff does support a prima facie case, the burden shifts to the defendant to articulate a non-age-related reason for its actions. *See Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978); *Mesnick,* 950 F.2d at 824. If the defendant fails to satisfy this requirement, then a plaintiff's summary judgment motion should be granted. *See Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094; *Gannon,* 777 F.Supp. at 170. If defendant does articulate a non-discriminatory reason, then the Court must determine whether, from all of the facts and inferences in the record, a rational factfinder could decide that defendant acted with discriminatory intent. *See United States Postal Service Bd. of Governors v. Aikens,* 460 U.S. 711, 716–17, 103 S.Ct. 1478, 1482–83, 75 L.Ed.2d 403 (1983); *Lawrence,* 980 F.2d at 73; *Mesnick,* 950 F.2d at 825.

[9] Plaintiff, who has presented no direct evidence, must rely on the *McDonnell Doug-*

---

3. *McDonnell Douglas* involved a Title VII sex discrimination suit. However, "[i]n general, the *McDonnell Douglas* model operates in the same way for Title VII cases as for cases brought under the federal Age Discrimination in Employment Act (ADEA)." *Pagano,* 983 F.2d at 347 n. 5.

*las* framework to prove that his non-promotion or his alleged loss of job responsibilities occurred because of his age or past age-related actions. Because the elements of the prima facie case vary depending on the type of adverse action as well as certain facts peculiar to each case, *see McDonnell Douglas,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13, the Court analyzes each of plaintiff's slightly different allegations separately below.

### B. Count I: Failure to Promote

#### 1. Discrimination Because of Age

■ Plaintiff's first claim is that he was not promoted because his employer considered him too old. First, there is no doubt that being denied a promotion constitutes an adverse employment action proscribed by the statute. *See, e.g., Pejic v. Hughes Helicopters, Inc.,* 840 F.2d 667, 674 (9th Cir.1988) (recognizes ADEA claim for failure to promote); *Lindsey v. American Cast Iron Pipe Co.,* 772 F.2d 799 (11th Cir.1985) (evidence sufficient to support employee's claim that employer violated ADEA by not promoting him because of his age); *Moynihan v. Massachusetts Mutual Life Ins. Co.,* 773 F.Supp. 502, 513 (D.Mass.1991) ("The *McDonnell Douglas* framework is appropriately applied to failure to promote, . . . it applies to age as well as gender discrimination claims . . ."). Second, since plaintiff has not produced any direct evidence that he was not promoted because of his age, in order to survive summary judgment, he must first establish a prima facie case. Specifically, he must show four elements: (1) he was within the protected age group (ie. over 40 years of age), (2) he applied for a promotion to a job for which he was qualified so as to meet the legitimate expectations of his employer, (3) he did not receive the promotion, and (4) the employer filled the position with a person possessing similar qualifications. *Cf. Lawrence,* 980 F.2d at 69 (discharge case); *Connell v. Bank of Boston,* 924 F.2d 1169, 1172 (1st Cir.) (discharge case), *cert. denied,* — U.S. —, 111 S.Ct. 2828, 115 L.Ed.2d 997 (1991).

### a. Plaintiff's Prima Facie Case

■ Clearly, Corrigan has presented evidence supporting two of the four elements. Corrigan was 48 years old when he applied for and was refused the promotion to the position of Associate Director and Superintendent of Securities, and the State filled the position with Fines, who was then 33 years old. However, the remaining elements, relating to plaintiff's qualifications, are key to this case. The parties disagree about whether the record contains any facts or inferences from which a reasonable juror could conclude that plaintiff possessed the qualifications necessary for the job.

Defendants note initially that the position was designed to enhance DBR's enforcement of securities laws, and, accordingly, the ability to practice law in Rhode Island was an essential requirement. Plaintiff admits that the fact that he had no law degree would appear to render him unqualified for the job, which on its face required membership in the Rhode Island Bar. However, he argues that the requirement was pretextual, created by defendants to exclude him from the job because of his age or his prior actions. He further contends that, with the exception of the law degree component, he was otherwise qualified for the position. He points out that, before the position of Associate Director and Superintendent of Securities was created, he received satisfactory evaluations during his 12 years of heading the securities office as the Chief Securities Examiner.

The Court agrees that Corrigan has presented enough evidence to create a genuine issue of fact regarding whether, but for the ability to practice law in Rhode Island, he was qualified for the promotion. Nonetheless, this point is moot, for, as discussed below, the Court finds no facts or inferences, beyond mere speculation, from which a reasonable factfinder could conclude that the law degree was a pretext rather than a legitimate requirement for the position of Associate Director and Superintendent of Securities.

#### i. Plaintiff's Evidence that He Was Qualified for the Position

Plaintiff contends that he has presented evidence which raises a genuine issue of fact

as to whether the law degree was actually a condition for the position. First, plaintiff points to past age-related incidents between DBR and himself as well as between DBR and another employee, Joseph Paolantonio. He presents this evidence not only to support his retaliation claims, but also to suggest that DBR officials have exhibited a pattern of bias against older employees. Corrigan explains that he has had reason to bring three age-related suits against the State in the past. In 1982, he sued, arguing that he was not selected for the then-vacant position of Chief Securities Examiner because he was 41 years old. He and the State settled the case for a cash payment. He claims that thereafter, he did not receive a raise given to others in his division, and that Arico told him that he would have to return what he had won in the first law suit before he could get a raise. He instituted a second suit claiming that he was excluded from the raise due to his 45 years of age and/or his previous ADEA lawsuit. This case also ultimately settled. Finally, in 1987, Corrigan and another DBR employee, Joseph Paolantonio, each sued under the ADEA, alleging age discrimination and retaliation as the reason they were excluded from a salary increase given to other employees within their division. Paolantonio received a jury verdict in his favor in the fall of 1988. Corrigan settled for an increase in salary grade in January 1989.

Plaintiff also points to uncontested evidence that the new position of Associate Director and Superintendent of Securities was the only DBR Associate Director and Superintendent position, excluding the head of the legal department, for which a law degree was required. He emphasizes that prior to the separation, the Associate Director and Superintendent of Banking and Securities was not required to have a law degree, and that a law degree was not a prerequisite for the position of Associate Director and Superintendent of Banking after the separation. Further, neither the DBR Director nor Deputy Director needed law degrees. He also notes that, while under his supervision, the securities office had aided in the prosecution of securities violations by interfacing with state and/or federal prosecutors or enforcement agencies.

Next, Corrigan turns to the manner in which the position was created, in an attempt to suggest that the position was designed especially for Fines. Corrigan admits that as early as November 1988, DBR Director Janes and his predecessor Director Mark Pfieffer as well as Deputy Director Arico had talked about separating the Banking and Securities Division, and that attorneys in DBR's legal division had supported hiring additional attorneys with securities expertise. Further, plaintiff recognizes that Janes and Arico discussed the concept with Willis Riccio, president or vice-president of NASD at that time, and that Riccio had supported the creation of a separate Division of Securities headed by an attorney. However, Corrigan emphasizes that, despite these 1988 discussions, the idea was dropped; absolutely no action was taken to implement the concepts until Michael Fines appeared on the scene a year later.

Corrigan notes that soon after Janes talked to then Attorney General O'Neil regarding O'Neil's nephew, Michael Fines, Janes began working with a sense of urgency to create and fill the position. In July, just after Fines was admitted to the Rhode Island bar, Janes and Arico spoke to the Governor's chief of staff, Markos, regarding creating a separate securities division. At that time, before they had interviewed any other potential candidates, Janes and Arico were already discussing placing Fines at the head of the new division. Corrigan highlights the fact that the Executive Order authorizing the new position did not specify the qualifications for the position, and thus did not require the possession of a law degree.

Corrigan also emphasizes the fact that in creating this new position and the criteria therefore, Janes and Arico did not consult Susan Hayes, the Associate Director and Superintendent of Banking and Securities, or Corrigan, the acting head of the securities office. Further, although the Division of Personnel usually is involved in assessing the need for new employees and in designing the job description for new positions, because the position was established by Executive Order, the division had no meaningful discretion to

question or reject the job as improper. In fact, Corrigan claims, the Personnel Administrator formally questioned the need for the position, opining that it duplicated Hayes's position.

Additionally, plaintiff suggests that recruiting efforts were designed to avoid, rather than attract, candidates other than Fines. The position was posted for applications within DBR for only seven days in August. The vacancy was not advertised in any newspaper or legal periodical, and related enforcement agencies, such as the SEC in Boston or the NASD office, were not notified. In contrast, Janes personally notified Fines about the position. Corrigan argues that not surprisingly, only two candidates applied: Fines and Corrigan. He notes that, despite the fact that only one applicant had a law degree, DBR engaged in no additional recruiting. To emphasize his point, Corrigan notes that juxtaposed to this minimal recruiting effort, DBR ran a wide advertising campaign regarding job vacancies after the banking crisis in Rhode Island.

Corrigan seems to imply that Fines's salary provides yet another clue that the State officials urgently wanted to hire Fines. Corrigan explains that, before engaging in any recruiting, Janes determined that a high salary step should accompany the position. Although standard personnel protocol requires documentation of unsuccessful recruiting efforts before top salary can be offered, because the position was "unclassified," Janes was able to offer Fines the high salary step. Finally, in an attempt to further emphasize the urgency Janes felt to hire Fines, Corrigan notes that Janes had Fines start the job even before the paperwork creating the position was completed.

### ii. Undisputed Facts Pointed Out By Defendant

Despite plaintiff's long list of facts and inferences, defendants explain that a number of undisputed facts support their contention that the law degree requirement was a legitimate condition for the position of Associate Director and Superintendent of Securities. First, prior to the hiring of Fines, during Corrigan's tenure heading the securities of-

fice as Chief Securities Examiner, DBR never prosecuted any securities violation cases. As Corrigan recognizes, years before the idea was implemented, DBR directors and legal staff began discussing the Banking and Securities Division's lack of prosecutorial and enforcement activity as well as the possibility of separating the Banking and Securities Division and heading the new Securities Division with a lawyer. Importantly, Fines commenced legal enforcement investigations and actions within weeks after he started working.

Additionally, although admitting that the creation of the position was rushed through, defendants explain that Janes and Arico followed all of the applicable rules in creating and filling the Associate Director and Superintendent of Securities position. Plaintiff does not dispute that O'Neil did not request any specific job for his nephew, but only asked Janes to discuss employment opportunities in Rhode Island with Fines. Further, after the Executive Order for the new position was signed, the legally required notice of the position was properly posted and distributed. Defendants also point out that successful candidate Fines had a law degree, securities law experience, and very positive recommendations.

### iii. Analysis Regarding Plaintiff's Qualification

Plaintiff relies on a number of inferences to create a factual question regarding his qualification for the promotion. However, none of these inferences, either alone or in tandem, constitute adequate evidence for his case. First, plaintiff attempts to show that a pattern of discriminatory behavior by the state actors explains the defendants' more current actions toward plaintiff. However, the evidence cannot support such a conclusion. The fact that plaintiff sued the State three times and the State settled each time cannot lead to the conclusion that the State was guilty of the behavior plaintiff alleged in those suits. Further, an isolated 1985 comment by Arico and a 1988 jury verdict in favor of a fellow employee on an age-related claim are not enough to support a conclusion that DBR officials were likely acting in a

discriminatory or retaliatory manner when they determined that the ability to practice law in Rhode Island was required for the position of Associate Director and Superintendent of Securities.

Next, plaintiff suggests that, because the new position was the only Associate Director and Superintendent position which required the ability to practice law in Rhode Island and because the securities office had interfaced with state and federal prosecutors in the past, the law degree requirement was likely unnecessary. However, plaintiff presents no evidence suggesting how, beyond the name, the Associate Director and Superintendent jobs are similar. Further, in light of the undisputed facts that DBR officials had discussed heading the Securities Division with a lawyer and that Fines immediately initiated legal actions on behalf of the Securities Division, plaintiff's evidence does not support the view that defendants imposed the law degree requirement illegitimately.

Additionally, plaintiff relies on a more complex line of reasoning to persuade a factfinder that he was qualified for the position. Specifically, plaintiff seems to argue that the defendants: (1) wanted Michael Fines to receive the position, (2) wished to have as few competitors for the position as possible to ensure that Fines would get the job, (3) thought that plaintiff would apply for the position, (4) did not want plaintiff to be a viable candidate, and, thus, (5) to exclude plaintiff, and perhaps other potential applicants as well, added on the requirement that the candidate be able to practice law in Rhode Island. However, this line of reasoning relies on leaps of logic. Admittedly, plaintiff has presented evidence that could support the first few steps of his theory. For example, the minimal advertising might suggest that Janes and Arico were interested in hiring Fines and desired to minimize the number of applicants. Further, since plaintiff was Chief Securities Examiner, one could assume that defendants thought he would seek the promotion. However, to therefore conclude that the defendants included the ability to practice law in Rhode Island among the job criteria solely to exclude plaintiff, and perhaps others, requires speculation. This is especially true since, as noted above, DBR officials had discussed heading the Securities Division with a lawyer long before Fines appeared on the scene and Fines immediately took advantage of his legal experience by initiating enforcement actions.

In sum, plaintiff has not presented sufficient evidence to support his contention that membership in the Rhode Island Bar was not a legitimate requirement for the position of Associate Director and Superintendent of Securities. Thus, he has failed to show that he was qualified for the job, and, accordingly, has failed to support a prima facie case. This lack of proof alone constitutes a sufficient basis for this Court to grant defendants' motion for summary judgment on the age discrimination aspect of Count I. *See Mesnick*, 950 F.2d at 824.

### b. *Discriminatory Animus*

Although no further analysis is necessary to dismiss the Count I ADEA claim based on age discrimination, the Court notes that the lack of any evidence suggesting that the defendants' actions resulted from a discriminatory animus provides an independent basis for dismissing the claim. *See, e.g., Aikens*, 460 U.S. at 716–17, 103 S.Ct. at 1482–83; *Lawrence*, 980 F.2d at 74; *Pagano*, 983 F.2d at 348–49; *Mesnick*, 950 F.2d at 825; *Connell*, 924 F.2d at 1179.

A plaintiff need not adduce any direct evidence or a "smoking gun" to forestall summary judgment. *Mesnick*, 950 F.2d at 824. However, in this case, viewing the entire record in plaintiff's favor, plaintiff has not even presented circumstantial evidence from which a factfinder could determine either that defendants' actions derived from anti-age considerations or that defendants' claim that plaintiff was not qualified for the position was a disguise for age discrimination. Plaintiff presents no statistical evidence showing disparate treatment by the employer of people in the protected age bracket; no invidious pattern of age-related discharges, forced early retirements, or non-promotions; no comments by decisionmakers which denigrate those over forty; and no reason, such as a desire not to pay a pension, why defendants may have been motivated by

plaintiff's age. *See Id.; Medina–Munoz*, 896 F.2d at 10. In fact, plaintiff stresses that defendants desired to hire Michael Fines because he was O'Neil's nephew. In support of this view, plaintiff emphasizes the urgency with which Janes and Arico acted to hire Fines, the limited advertising regarding the position, and the high salary step given to Fines. However, while such facts may be true, they cut against the notion that defendants' actions resulted from discriminatory feelings toward Corrigan because of his age.

The "ADEA does not stop a company from [not promoting] an employee for any reason (fair or unfair) or for no reason, so long as the decision to [not promote] does not stem from the person's age." *Freeman*, 865 F.2d at 1341. Therefore, with no genuine evidence from which a rational factfinder could conclude that age was a determining factor in the employer's decision, plaintiff cannot succeed on this claim.

### 2. Retaliation

■ Corrigan also alleges that DBR officials failed to promote him in retaliation for his former age-related court actions. Plaintiff relies on a slightly adapted version of the *McDonnell Douglas* burden shifting framework in an attempt to prove his claim. The prima facie case for a retaliation claim has three elements: (1) plaintiff engaged in activity protected under ADEA, (2) plaintiff subsequently suffered an actionable adverse employment action, and (3) a causal connection, or nexus, exists between the protected activity and the subsequent adverse employment action. *Mesnick*, 950 F.2d at 827; *Connell*, 924 F.2d at 1179.

■ As with the prima facie case for age discrimination, not all of the elements are seriously contested. Clearly the record supports plaintiff's contention that he engaged in activity protected under the age discrimination statute by bringing three prior age-related claims against the State, and that he subsequently was refused a promotion. However, even viewed in the light most favorable to the plaintiff, no facts or inferences in the record connect the non-promotion to the protected activity.

Plaintiff points to all of the evidence previously discussed in the age discrimination context. He contends that a pattern of retaliatory behavior by DBR officials is revealed by the evidence of the State settling his past three lawsuits, Arico's statement that Corrigan would not get a raise until he returned the money he had received in settlement of his earlier lawsuit, and the fact that a co-worker succeeded in a jury trial suit against the State on an age-related complaint. He further argues that, since he had been acting as head of the securities division for over ten years and since only nine months elapsed between the settlement of his third lawsuit and his non-promotion, a juror could infer that this pattern of retaliatory behavior spilled over into DBR's decision to deny him the promotion.

Nevertheless, the Court considers these facts and inferences inadequate to create a jury question regarding whether plaintiff's non-promotion was causally related to his previous ADEA-protected activity. First, regarding plaintiff's evidence of an alleged pattern of retaliatory behavior, as discussed above in the age discrimination context, a factfinder could not discern such a pattern based on Corrigan's repeated lawsuits. Additionally, as noted above, Arico's alleged isolated 1985 statement and a co-worker's successful suit are insufficient proof to raise a genuine issue about whether a pattern of retaliation manifested itself in defendants' choice of Fines over plaintiff. Further, the nine month period between the settlement and the non-promotion does not provide adequate evidence of a nexus between the two events. *See Mesnick*, 950 F.2d at 828 (characterizing a nine month delay as a "long gestation period" tending to suggest the "absence of a causal connection between the statutorily protected conduct and the adverse employment action, not the converse"). Finally, once again plaintiff's evidence that defendants' chose Fines as a favor to Attorney General O'Neil cuts against a finding that the non-promotion occurred in retaliation for plaintiff's statutorily protected activities.

### B. Count IV: Removal of Duties

Plaintiff also claims that after Fines assumed the position of Associate Director and

Superintendent of Securities, defendants harassed plaintiff by allowing the removal of all of his job duties, assigning him entry-level tasks, and placing critical memoranda in his file in violation of ADEA. At this stage of the litigation, defendants do not dispute whether these actions occurred. Instead, they argue both that these types of employment actions are not prohibited by the statute and that plaintiff has not shown that the actions, if they did occur, were motivated by plaintiff's age or his previous lawsuits. As the Court agrees with defendants' latter conclusion, it need not determine whether the statute proscribes the adverse actions about which plaintiff complains.

### 1. Age Discrimination

 Plaintiff argues that Janes, Arico, and Fines harassed him by removing all of his duties and assigning him entry-level tasks because of his age. As with the previous claims, he provides no direct proof and so attempts to rely on the *McDonnell Douglas* framework. However, plaintiff has not presented, and the Court has not located, any authorities applying a prima facie case in a situation comparable to the present one. The Court could devise a prima facie case to determine if plaintiff created an initial inference of discrimination. However, such analysis is unnecessary, for the Court, which has all of the summary judgment evidence before it, can discern no sufficiently sturdy indication that the alleged adverse employment actions were a manifestation of any anti-age sentiment. *See Aikens*, 460 U.S. at 715, 103 S.Ct. at 1482 (after all of the evidence was presented, the "District Court was then in a position to decide the ultimate factual issue in the case").

Plaintiff argues that the harassment to which he was subjected was an integral part of defendants' original plan to establish the position for Fines and to eliminate plaintiff. To support his contention that defendants' alleged harassment was motivated by an anti-age animus, he points to the evidence he highlighted for Count I, such as the alleged pattern of discrimination which required him to bring three lawsuits as well as the irregular manner in which Fines was chosen for the

position. Additionally, plaintiff suggests that a juror could conclude that age discrimination occurred based on the actions themselves, i.e. removing the primary duties of a 49 year old man who had been performing satisfactorily, assigning him entry-level tasks, and criticizing him.

Defendants explain that, contrary to plaintiff's suggestion, they were not trying to freeze him out of the Division. Rather, during the time period about which plaintiff complains, they were in the midst of reorganizing the new Securities Division and determining how to best utilize the new skills Fines offered while simultaneously attempting to deal with the request plaintiff made to be transferred to another division. Further, defendants note that it is undisputed that the duties Fines assumed were within his job description and that Fines, though he may have criticized and been abrasive toward plaintiff, treated all co-workers in a similar manner.

Even viewing the evidence in the light most favorable to plaintiff, as noted above, the Court finds plaintiff's evidence inadequate to support a conclusion that defendants' actions were motivated by age discrimination. First, plaintiff presents no evidence, beyond conclusory statements, that the alleged adverse actions were part of a plot to drum plaintiff out of the Division, because of his age or otherwise. Second, the Court is no more persuaded in this context than under Count I that a factfinder could discern a pattern of age discrimination by DBR. Further, in accordance with this writer's foregoing analysis, reliance on an inference that defendants failed to promote plaintiff because of his age in an attempt to suggest that the alleged harassment was also age-related is unavailing. Finally, the fact that plaintiff, who was demanding a transfer while the new Securities Division was in the midst of reorganizing, was allegedly assigned no work other than a few low-level tasks and was, like others in the division, criticized by his new boss despite his many years of satisfactory service is inadequate to support a conclusion that these actions occurred because he was 49 years old.

## 2. Retaliation

■ Plaintiff also argues that defendants harassed him as punishment for his prior age-related lawsuits. He contends that he has presented direct evidence implicating Fines and that he has provided adequate circumstantial evidence regarding both Fines and the other defendants.

Turning first to the direct evidence, at his deposition Fines acknowledged that he knew plaintiff planned to initiate a lawsuit if plaintiff did not get a transfer. Fines indicated that he viewed plaintiff as a "credible threat" to bring a suit because of plaintiff's past legal actions. Fines also said that he did not want to get involved in the middle of legal action, and that he therefore did not want to be in a position to make plaintiff work. Plaintiff interprets these comments as showing that Fines retaliated against plaintiff by not giving him work because of his past law suits. However, such an interpretation cannot be gleaned from the deposition of Fines. First, Fines's comments do not suggest that a desire to punish plaintiff for his past lawsuits motivated any of his actions. Rather, Fines said that, to avoid being in the middle of the threatened lawsuit, he was trying to accommodate plaintiff; he did not assign plaintiff work so as not to delay plaintiff's transfer by entangling him in new work projects. Corrigan cannot threaten to sue if he does not get transferred, and then argue that Fines's actions to comply with Corrigan's demands constitute direct evidence of retaliation.

Plaintiff also argues that he can successfully avoid summary judgment under a *McDonnell Douglas* framework adapted to the retaliation context. As noted above, the elements for a prima facie case for retaliation are: (1) plaintiff engaged in activity protected under ADEA, (2) plaintiff subsequently suffered an actionable adverse employment action, and (3) a causal connection, or nexus, exists between the protected activity and the subsequent adverse employment action. *Mesnick,* 950 F.2d at 827; *Connell,* 924 F.2d at 1179.

There is no dispute that defendants knew plaintiff engaged in protected activity. Although defendants argue that the actions about which plaintiff complains fail to qualify as adverse employment actions under the statute, again as above, the Court need not address this issue. Instead, as discussed below, the Court concludes that the insufficiency of the evidence to support a causal connection requires a ruling in defendants' favor.

Plaintiff's arguments are by now familiar. He claims that the record indicates a pattern of retaliatory behavior; that the harassment was part of a plot to eliminate him from the Division that began with the selection of Fines; that the temporal proximity of the harassment to the settlement of his third lawsuit suggests that the two are connected; and that, in light of his experience, the harassing actions themselves evidence retaliation. Defendants again contend that any actions to which plaintiff may have been subjected resulted from the Division's reorganization and plaintiff's transfer demand, rather than retaliation.

Without going into detail, the Court concludes that plaintiff's arguments remain unpersuasive in this context. The evidence in the record cannot support a conclusion that a pattern of retaliation existed. Similarly, the combination of the nine month period between the non-promotion and the lawsuit settlement plus plaintiff's prior satisfactory experience as Chief Securities Examiner do not create a genuine issue regarding whether retaliation occurred in this particular instance.

## III. Section 1983 Constitutional Violation Claims

Corrigan also asserts four separate counts under the Civil Rights Act of 1871, 42 U.S.C. § 1983, which allows persons to sue for violations of their constitutional rights carried out under color of state law.[4] In this case, two of Corrigan's claims involve alleged violations of

---

4. Section 1983 states, in part:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immu-
 nities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. § 1983.

his First Amendment right to freedom of speech and to petition the government, while the other two seem to be based on alleged violations of his First Amendment rights regarding political association.

■ The State is not susceptible to suit in federal court under 1983 claims, *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989), however, state agents can be sued in their official capacities for prospective injunctive relief, *id.* at 491 U.S. 71 n. 10, 109 S.Ct. 2311 n. 10. In this case, plaintiff seeks both prospective injunctive relief and monetary damages. Accordingly, in the Complaint plaintiff names Whitehouse and Arico in their official capacities as well as Janes and Arico individually as defendants in all four of the 1983 counts,[5] and Fines, in both his official and individual capacities, in two of the counts. All defendants argue that the claims have no support in fact or law while the individual defendants contend that they have qualified immunity from liability under all of the claims. The Court agrees that the claims have no merit, and thus need not reach the issue of qualified immunity.

### A. Violation of First Amendment Speech and Petition Rights

Corrigan alleges that defendants, under color of state law, violated his First Amendment right to bring suit by retaliating against him for his prior age-related actions against the State. As with the age claims, he asserts one count relating to the defendants' failure to promote him and another concerning his subsequent working conditions.

■ Plaintiff bases his claim on the *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), line of cases. In *Mt. Healthy*, the Supreme Court determined that a state actor may not refuse to hire an employee solely as a result of that employee's exercise of his free speech rights. *Id.* To succeed on a Section 1983 claim the plaintiff must prove, by a preponderance of the

evidence, that his constitutionally protected activities were a "substantial" or "motivating" factor in the adverse employment decisions undertaken by defendants. *Id.* 429 U.S. at 287, 97 S.Ct. at 576. If the plaintiff meets this burden, then the burden of proof shifts to the employer to prove, by a preponderance of the evidence, that the employer would have made the identical employment decision "even in the absence of the protected activity." *Id.; see also, e.g., Pilkington v. Bevilacqua*, 439 F.Supp. 465, 473 (D.R.I. 1977), *aff'd*, 590 F.2d 386 (1st Cir.1979).

In this case, Corrigan claims that his prior lawsuits constituted constitutionally protected activity and were a "substantial" or "motivating" factor in defendants' decisions to not promote him and to subject him to harassment. First, he argues that the right to bring a lawsuit is protected by the First Amendment, both as speech on a matter of public concern (i.e. the State's allegedly discriminatory actions), *see Givhan v. Western Line Consolidated School Dist.*, 439 U.S. 410, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979) (dismissal of public school teacher for her complaints about racially discriminatory employment practices at the school violated her First Amendment rights), and as part of the right to petition the government for redress, *see California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S.Ct. 609, 613, 30 L.Ed.2d 642 (1972) ("The right of access to the agencies and courts ... is part of the right of petition protected by the First Amendment"). Next, plaintiff relies on the evidence he marshalled in the ADEA context to demonstrate that his prior lawsuits constituted a "motivating factor" in defendants' decisions to retaliate against him.

Finally, plaintiff contends that the protection against adverse employment actions established by the *Mt. Healthy* line of cases extends beyond refusals to hire and discharges to non-promotions and serious employment harassment. Although he presents no direct authorities, he analogizes to cases involving government employees' rights of freedom of political belief and association.

---

**5.** As explained above in note 1, the Complaint named Janes and Arico in their individual capacities as defendants in Count III, although plaintiff now concedes that they have valid qualified immunity defenses to that Count.

As discussed more fully in the next section, the Supreme Court has determined that adverse employment actions violate a nonpolicymaking employee's First Amendment rights if based on that employee's political beliefs or associations, or lack thereof. *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). In that context, the Supreme Court explicitly extended the protection to employers' refusals to promote, transfer, or recall employees based on political affiliations. *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). Similarly, the First Circuit proscribed politically motivated action resulting in a "work situation 'unreasonably inferior' to the norm for the position." *Agosto-de-Feliciano v. Aponte-Roque,* 889 F.2d 1209, 1218 (1st Cir. 1989).

■■■ The Court agrees that a state employer violates a government employee's First Amendment rights by retaliating against that employee for bringing an employment discrimination lawsuit. Additionally, while the Court believes that the *Rutan–Agosto-de-Feliciano* line of cases may apply in this similar context, it is unnecessary for the Court to determine if defendants' actions in this case fall into the prohibited category. Importantly, the conclusion the Court reached above in the ADEA retaliation context precludes success by plaintiff here. As discussed above, the record contains insufficient evidence from which a rational juror could determine that defendants' actions, either in not promoting plaintiff or in allegedly removing all of his job duties, were in retaliation for or substantially motivated by plaintiff's prior law suits. Thus, plaintiff cannot support his claims that his First Amendment rights were violated.

B. Political Sponsorship

■■■ Finally, Corrigan asserts that his First Amendment rights were violated because defendants' decisions to not promote him and to remove all of his job responsibilities allegedly were based on his lack of appropriate political sponsorship. He essentially argues that Janes and Arico chose Fines, rather than him, for the position of Associate Director and Superintendent of Securities because Fines had the political sponsorship of Attorney General O'Neil. Similarly, he argues that Janes, Arico, and Fines subjected him to adverse employment conditions because he did not have the political sponsorship of Attorney General O'Neil. Corrigan relies on the legal theory, discussed briefly above, that a government employee should not be discharged solely because of his political beliefs and associations, unless partisan affiliation is an appropriate criterion for the position. *See Elrod,* 427 U.S. at 373, 96 S.Ct. at 2689; *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294. Additionally, because plaintiff was not discharged, he turns to *Rutan,* 497 U.S. at 76, 110 S.Ct. at 2738, and *Agosto-de-Feliciano,* 889 F.2d at 1218, for the proposition that adverse employment actions which do not amount to a discharge or constructive discharge are also actionable if they stem from the employee's political affiliation. However, as explained below, the logic behind the *Elrod–Branti–Rutan* line of cases makes it abundantly clear that such a legal theory has no application here.

■■■ The First Amendment protects the right of an individual to choose his political beliefs and associations. In fact, the Supreme Court has recognized that "political belief and association constitute the core of those activities protected by the First Amendment," *Elrod,* 427 U.S. at 356, 96 S.Ct. at 2681, and that "[t]he First Amendment prevents the government, except in the most compelling circumstances, from wielding its power to interfere with its employees' freedom to believe and associate, or to not believe and not associate," *Rutan,* 497 U.S. at 76, 110 S.Ct. at 2738. Thus, the *Elrod–Branti* line of cases ensures that public employees are not coerced into compromising their true political beliefs by a fear of adverse employment consequences if they do not affiliate with or are not sponsored by the prevailing political party. *Rutan,* 497 U.S. at 73–74, 110 S.Ct. at 2736; *Branti,* 445 U.S. at 517, 100 S.Ct. at 1294; *Agosto-de-Feliciano,* 889 F.2d at 1218. Accordingly, to avoid summary judgment, the nonmoving employee must present evidence that would persuade a

factfinder that the adverse employment actions to which he was subjected "would place substantial pressure on even one of thick skin to conform to the prevailing political view," *Agosto–de–Feliciano,* 889 F.2d at 1218, as well as evidence that would "permit the factfinder to conclude by a preponderance of the evidence that the changes in the nonmoving employee's work situation were motivated by discrimination on the basis of political affiliation," *Rodriguez–Pinto,* 982 F.2d at 39 (citing *Agosto–de–Feliciano,* 889 F.2d at 1220).

 In this case, plaintiff fails to provide any evidence that the adverse employment actions were due to discrimination on the basis of his political beliefs, political associations, or any other constitutionally safeguarded interest. The First Circuit recently rejected a claim for similar reasons. *Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 56–58 (1st Cir.1990). In *Correa–Martinez,* a former employee of Puerto Rico's judicial branch argued that three jurists violated his First Amendment right of association by forcing him to resign because of his friendship with the former administrative judge "with whom defendants have personal and political differences." *Id.* at 56. The First Circuit upheld the granting of a motion to dismiss, reasoning that, as Correa–Martinez mentioned nothing about any political contours of his relationship with the former administrative judge, his friendship with the judge was not a constitutionally protected association. *Id.* at 56–58. Therefore, the Court explained, deprivations due to that association, and not plaintiff's political beliefs or political associations, do not give rise to First Amendment violation claims. *Id.* at 57–58.

As Corrigan makes absolutely no reference to political beliefs or associations, the argument to dismiss the claims in this case is even stronger. Corrigan "does not allege that his politics, his ideology, or his advocacy of political goals led to his downfall." *Id.* at 57. Neither the Complaint nor any evidence in the record point out the partisan affiliations of plaintiff, the defendants, or Attorney General O'Neil. Further, plaintiff does "not maintain that defendants knew anything about plaintiff's politics or that their motivation related in the slightest to plaintiff's exercise of any first amendment or other constitutionally protected right." *Id.* at 58. Instead, he relies on the idea of "political sponsorship," claiming that Fines, and not plaintiff was sponsored by a political figure. While courts have determined that a public employee should not be subjected to adverse employment conditions because he fails to acquire "political sponsorship" from the party in power, *see, e.g., Branti,* 445 U.S. at 517, 100 S.Ct. at 1294, as discussed above, such reasoning arises from a concern that the employee not be coerced to compromise his political beliefs or associations. In this case, any sponsorship Fines may have enjoyed, and plaintiff may have lacked, derived from Fines's blood relationship with Attorney General O'Neil, not from political beliefs or associations. The record does not indicate, and plaintiff does not suggest, that he could have attained sponsorship by altering his political beliefs or affiliations. Therefore, plaintiff has presented no evidence from which to conclude that his First Amendment rights were violated.

*IV. State Age Discrimination Claims*

 Dismissing all of plaintiff's federal claims leaves only the RI–FEPA claims. Plaintiff, who has not alleged diversity of citizenship, relies on the Court's pendent jurisdiction. A federal court may exercise pendent jurisdiction over a state law claim if, at the outset, there is a substantial federal claim and the state and federal claims "derive from a common nucleus of operative fact." *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). However, even when the *Gibbs* test is met, a district court enjoys considerable authority to determine whether or not to exercise its pendent jurisdiction. *Id.* 383 U.S. at 726, 86 S.Ct. at 1139; *Newman v. Burgin,* 930 F.2d 955, 963 (1st Cir.1991). Importantly, the Supreme Court has recognized that, "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise juris-

diction over the remaining state-law claims." *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350 n. 7, 108 S.Ct. 614, 619 n. 7, 98 L.Ed.2d 720 (1988). Accordingly, as in most cases in which all federal-law claims have been eliminated, the Court declines to exercise its jurisdiction over the Rhode Island state law claims.

## CONCLUSION

Consistent with the foregoing analysis, the Court grants summary judgment for all defendants on all federal claims against them, and declines to exercise jurisdiction over the remaining state law claims. The Clerk will enter judgment for all defendants forthwith.

It is so Ordered.