April 22, 1993 UNITED STATES COURT OF APPEALS

 FOR THE FIRST CIRCUIT

 

No. 92-2084

 CARMEN NEREIDA-GONZALEZ,

 Plaintiff, Appellant,

 v.

 CIRILO TIRADO-DELGADO, ET AL.,

 Defendants, Appellees.

 

 ERRATA SHEET

 The opinion of the Court issued on April 14, 1993, is
corrected as follows:

 On page 11, 4 lines from bottom change "jury" to
"factfinder"

 UNITED STATES COURT OF APPEALS
 FOR THE FIRST CIRCUIT

 

No. 92-2084

 CARMEN NEREIDA-GONZALEZ,

 Plaintiff, Appellant,

 v.

 CIRILO TIRADO-DELGADO, ET AL.,

 Defendants, Appellees.

 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF PUERTO RICO

 [Hon. Juan M. Perez-Gimenez, U.S. District Judge]
 

 

 Before

 Breyer, Chief Judge,
 

 Torruella and Selya, Circuit Judges.
 

 

 Hector Urgell Cuebas for appellant.
 
 Vannessa Ramirez, Assistant Solicitor General, with whom
 
Reina Colon de Rodriguez, Acting Solicitor General, was on brief,
 
for appellees.

 

 April 14, 1993

 

 SELYA, Circuit Judge. In this case, plaintiff-
 SELYA, Circuit Judge.
 

appellant Carmen Nereida-Gonzalez (Nereida), a veteran government

employee displeased by a series of adverse employment actions,

sued two of her superiors. The district court granted the

defendants' motion for summary judgment. Nereida appeals. We

affirm in part, reverse in part, and remand for further

proceedings.

 I.
 

 Background
 

 We limn the facts in the light most advantageous to the

summary judgment loser, consistent with record support, as Fed.

R. Civ. P. 56 requires. See, e.g., Amsden v. Moran, 904 F.2d
 

748, 749 (1st Cir. 1990), cert. denied, 498 U.S. 1041 (1991).
 

 Appellant, a known member of the New Progressive Party

(NPP), started working for the Commonwealth of Puerto Rico in the

1960s. By 1984, she occupied a career position in the State

Insurance Fund (SIF), a government agency.1 In November of that

year, the incumbent NPP governor lost the gubernatorial election

to a member of the rival Popular Democratic Party (PDP). Hot on

the heels of the change in command two PDP loyalists, defendants

Cirilo Tirado-Delgado (Tirado) and Rafael Rivera Gonzalez

(Rivera), received high-level SIF appointments Tirado as

Administrator of the SIF, Rivera as Director of Personnel.

 

 1Appellant served as executive assistant to SIF's Director
of Administrative Services. The defendants did not urge below,
and have not contended on appeal, that political affiliation is
an appropriate criterion for this position.

 3

 Once ensconced at the agency, the defendants allegedly

informed appellant that she would be demoted because of her

political affiliation. The prophecy soon became a reality. By

letter dated June 20, 1985, Rivera advised appellant that her

position was being eliminated as part of a departmental

reorganization and that, consequently, she was being transferred

to a different SIF position as assistant to the Director of the

Systems and Procedures Office. Rivera's letter acknowledged that

"[t]his transfer represents a demotion."

 Although the defendants now struggle to portray the

reassignment as a lateral transfer, the record bears out Rivera's

initial characterization of the move. The base salary for

appellant's new position ($1565 per month) was significantly

lower than the base salary for her former position ($1915 per

month). The terms of her employment provided that, until the gap

was closed, she would continue to be paid at her accustomed rate,

but the difference between her new base salary and her actual pay

would absorb any raises or bonuses she otherwise would have been

eligible to collect. Thus, while appellant's pay was not reduced

outright, it was effectively frozen and her ability to earn more

money was circumscribed. This situation lasted at least until

February 3, 1987, when Tirado informed appellant by letter that,

in terms of salary and classification, her new position was being

upgraded to the level of her previous position.

 The demotion damaged appellant's pride as well as her

pocketbook. Her new job, unlike her old one, did not entail

 4

supervisory responsibilities. What is more, even the modest

functions and duties corresponding to the new job title were

placed beyond her reach as she was asked to perform only clerical

tasks. As a final indignity, although the defendants abolished

appellant's former position on paper, its functions remained

essentially intact and were performed by an employee with ties to

the PDP.

 Asserting that she had been constructively discharged,

or, alternatively, demoted because of her exercise of First

Amendment rights, and contending that the adverse personnel

actions undertaken at defendants' direction deprived her of

property without due process of law, appellant brought suit under

42 U.S.C. 1983 (1988). She sought both equitable relief and

money damages. The district court gave her cold gruel, entering

summary judgment in defendants' favor on all claims. This appeal

followed.

 II.
 

 Discussion
 

 A
 

 Summary Judgment
 

 Summary judgment exists to "pierce the boilerplate of

the pleadings and assay the parties' proof in order to determine

whether trial is actually required." Wynne v. Tufts Univ. Sch.
 

of Medicine, 976 F.2d 791, 794 (1st Cir. 1992), petition for
 

cert. filed, 61 U.S.L.W. 3586 (U.S. Feb. 3, 1993) (No. 92-1334).
 

Such a disposition is appropriate when "the pleadings,

 5

depositions, answers to interrogatories, and admissions on file,

together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party

is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(c). A genuine issue exists when there is evidence sufficient

to support rational resolution of the point in favor of either

party. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
 

248 (1986); United States v. One Parcel of Real Property, Etc.,
 

960 F.2d 200, 204 (1st Cir. 1992). A genuinely disputed issue

concerns a material fact if the fact carries with it the

potential to affect the outcome of the suit under the applicable

law. See Anderson, 477 U.S. at 248; Rivera-Muriente v. Agosto-
 

Alicea, 959 F.2d 349, 352 (1st Cir. 1992). This framework
 

remains intact when qualified immunity issues are presented

despite the potential of such defenses, in other ways, to "create

strange procedural configurations." Amsden, 904 F.2d at 752.
 

 Because the granting of summary judgment necessarily

involves applying a legal standard to facts which must, by

definition, be undisputed, appellate review of a district court

order under Rule 56 is plenary. See Wynne, 976 F.2d at 794;
 

Amsden, 904 F.2d at 752.
 

 B
 

 Constructive Discharge
 

 We need not tarry over appellant's most touted

initiative: her claim that she was constructively discharged in

reprisal for the free exercise of her First Amendment rights. We

 6

have ruled, squarely and recently, that a "claim of constructive

discharge due to a demotion or transfer cannot succeed when a

claimant, in fact, has not left employment." Pedro-Cos v.
 

Contreras, 976 F.2d 83, 85 (1st Cir. 1992) (per curiam)
 

(collecting cases); accord Rodriguez-Pinto v. Tirado-Delgado, 982
 

F.2d 34, 37 (1st Cir. 1993). In this instance, appellant

concedes that she never left the SIF payroll. Accordingly, her

constructive discharge claim fails as a matter of law.

 C
 

 Transfer and Demotion
 

 Next, appellant claims that she was transferred and

demoted for the same (impermissible) reason: to punish her for

exercising prerogatives of free association and the like

guaranteed to her by the First Amendment. Because this claim is

scissile, its component parts are best treated separately.

 The Claim for Money Damages
 

 Insofar as appellant's First Amendment transfer-and-

demotion claim is one for compensatory damages, we conclude that

the doctrine of qualified immunity bars recovery. Qualified

immunity shields government officials performing discretionary

functions from civil liability for money damages when their

conduct does not violate "clearly established" statutory or

constitutional rights of which a reasonable person would have

known. Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The
 

determination is time-critical. See, e.g., Goyco de Maldonado v.
 

Rivera, 849 F.2d 683, 684 (1st Cir. 1988). Here, the key actions
 

 7

of which appellant complains occurred before 1989. This court

had not yet decided Agosto-De-Feliciano v. Aponte-Roque, 889 F.2d
 

1209 (1st Cir. 1989) (en banc) and the Supreme Court had not yet

decided Rutan v. Republican Party of Illinois, 110 S. Ct. 2729
 

(1990). As we explain below, this chronology gets the grease

from the goose.

 Before 1989, that is, throughout the period when the

present defendants allegedly acted to appellant's detriment,2 it

was a subject of much conjecture whether the constitutional

prohibition against politically motivated firings extended to

other personnel actions, such as refusals to hire, demotions, and

failures to promote. See Rodriguez-Pinto, 982 F.2d at 38;
 

Aviles-Martinez v. Monroig, 963 F.2d 2, 6 (1st Cir. 1992); Roque-
 

Rodriguez v. Lema Moya, 926 F.2d 103, 107-09 (1st Cir. 1991);
 

Nunez-Soto v. Alvarado, 918 F.2d 1029, 1030 (1st Cir. 1990). In
 

the absence of a clearly established right on the part of public

employees even civil servants to engage in politics without

fear of demotion, the irresistible conclusion is that the instant

defendants are entitled to don the cloak of qualified immunity.

Therefore, the lower court appropriately scotched appellant's

 

 2The record is tenebrous as to whether petty harassment
(e.g., shortstopping of responsibilities) continued after 1989.
 
But, it is apparent that, by then, the major hardships (e.g.,
 
reduced compensation) had been ameliorated. Thus, there seems to
be little basis for arguing that, in 1989, Agosto-De-Feliciano
 
stripped the cloak of qualified immunity from the defendants vis-
a-vis any remnants of the alleged mistreatment thereafter
occurring, and, indeed, appellant has made no such argument on
appeal.

 8

claim for compensatory damages at the summary judgment stage.3

 The Claim for Equitable Relief
 

 The remaining furculum of appellant's First Amendment

transfer-and-demotion claim has more meat on its bones. A

primary purpose of providing officials with qualified immunity is

to ensure that fear of personal liability will not unduly

influence or inhibit their performance of public duties. See,
 

e.g., Anderson v. Creighton, 483 U.S. 635, 638 (1987); Harlow,
 

457 U.S. at 814; Carlson v. Green, 446 U.S. 14, 21 n.7 (1980).
 

This purpose is achieved when the official is held harmless from

personal liability. Not surprisingly, then, qualified immunity

confers immunity only from individual-capacity suits, such as

suits for money damages, that have been brought against

government actors. Here, Nereida sued the defendants both

individually and in their official capacities. As we have

explained, the doctrine of qualified immunity sets the

individual-capacity claims to rest. But, the official-capacity

claims are qualitatively different: when a plaintiff sues a

state official in the latter's official capacity, as opposed to
 

the latter's personal capacity, the underlying rationale for
 

qualified immunity has no bite.

 An official capacity suit is, in reality, a suit

against the governmental entity, not against the governmental

 

 3Appellant has not asserted that her claim for compensatory
damages should proceed against the defendants in their official
capacities, and we do not consider, therefore, whether sovereign
immunity would bar the maintenance of such an action in federal
court.

 9

actor. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985);
 

Brandon v. Holt, 469 U.S. 464, 471-72 (1985); Monell v. New York
 

City Dep't of Social Servs., 436 U.S. 658, 690 n.55 (1978);
 

American Policyholders Ins. Co. v. Nyacol Prods., Inc., F.2d
 

 , (1st Cir. 1993) [No. 92-1949, slip op. at 7-8];

Northeast Fed. Credit Union v. Neves, 837 F.2d 531, 533 (1st Cir.
 

1988). Consequently, when a plaintiff seeks equitable relief

from a defendant in his capacity as an officer of the state,

qualified immunity is not a viable defense. See, e.g., Wood v.
 

Strickland, 420 U.S. 308, 314 n.6 (1975) (stating that "immunity
 

from damages does not ordinarily bar equitable relief");

Rodriguez-Pinto, 982 F.2d at 38-40 (vacating summary judgment
 

with respect to claims for equitable redress notwithstanding

defendants' qualified immunity). So it is here. To the extent

that appellant, on First Amendment grounds, seeks equitable

relief such as reinstatement in her former position, the defense

of qualified immunity does not obtain.

 Absent the interposition of qualified immunity, we must

look to what rights we now believe the law conferred on a

government worker at the time in question, rather than merely

seeking to ascertain what rights were clearly established at that

time. See Rodriguez-Pinto, 982 F.2d at 38-40. We begin this
 

probe by gauging the respective gravitational pulls exerted by

Agosto-De-Feliciano and Rutan as they palpitate in this case. 
 

 In Agosto-De-Feliciano, we determined that the First
 

Amendment's proscription of patronage dismissals as formulated by

 10

the Court in Elrod v. Burns, 427 U.S. 347 (1976) and Branti v.
 

Finkel, 445 U.S. 507 (1980), encompasses situations in which a
 

government employer's actions fall short of discharge or

constructive discharge but nonetheless result in an altered work

situation "unreasonably inferior to the norm" for the position in

question. Agosto-De-Feliciano, 889 F.2d at 1218 (internal
 

quotation marks omitted). We coupled this substantive standard

with a procedural requirement that the plaintiff establish the

change in conditions "by clear and convincing evidence." Id. at
 

1220.

 Shortly after we decided Agosto-De-Feliciano, the
 

Supreme Court cast further illumination on the issue. In Rutan,
 

110 S. Ct. at 2739, the Court extended the Elrod/Branti
 

principles to government employment decisions concerning hiring,

promotion, transfer, and recall of public employees. It is an

interesting question whether some vestige of Agosto-De-Feliciano
 

survives Rutan, thereby providing a sort of halfway house an
 

intermediate First Amendment haven for employees wounded by

slings and arrows less damaging than those described by the Rutan
 

Court. But if there are cases that elude Rutan yet still come
 

within Agosto-De-Feliciano's reach a matter which we need not
 

decide instances of actual demotion are not among them. While

Rutan's precise contours may arguably be indistinct, it is clear
 

that Rutan's doctrinal influence suffuses situations in which an
 

employee has actually been demoted.

 Under Rutan, then, a plaintiff who has held a non-
 

 11

policymaking job in the public sector may ordinarily forestall

summary judgment by pointing to evidence in the record which, if

credited, would permit a rational factfinder to conclude that a

demotion occurred and that it stemmed from a politically based

discriminatory animus. Nereida passes this test.

 There can be no disputing that the record contains

evidence sufficient to justify a trier in finding that a demotion

occurred. Under the NPP-led regime, appellant occupied a position

with supervisory and coordinating functions. When the new regime

settled in, she was shifted to a less lustrous position in a

lower pay bracket. Her affidavit also relates that she was

effectively deprived of raises and similar due-course increments,

divested of supervisory powers, and assigned "only nominal tasks

. . . of a clerical nature." These facts, if proven, together

with defendants' contemporaneous characterization of her transfer

as a step down, would unquestionably permit a finding that

appellant was, in fact, demoted.

 Appellant has likewise adduced sufficient evidence of

discriminatory animus. According to her affidavit, the

defendants told her outright that she would "be demoted and

assigned to another position without any responsibilities or

duties" because of her NPP affiliation. This direct evidence of

discriminatory animus, although denied by defendants, is adequate

to ward off summary judgment on the point. Cf. Fed. R. Evid. 801
 

(d)(2)(A) (statements of party-opponent made in either an

individual or a representative capacity are not considered

 12

hearsay). In this case, moreover, the direct evidence is

buttressed by other facts of record from which a factfinder could

reasonably conclude that: (1) appellant was a known member of

the NPP; (2) she was transferred on the premise of what some

evidence indicates was a sham reorganization; and (3) a number of

other personnel actions allegedly occurred at about the same

time, all of which involved insinuating PDP members into career

positions previously held by NPP members. On this scumbled

record, a reasonable factfinder, drawing inferences favorable to

appellant and making credibility determinations in her favor,

could easily conclude that the defendants acted out of

discriminatory animus.4

 Because our canvass of the record reveals evidence

which, if credited, would warrant a reasonable factfinder in

concluding that appellant was entitled to reinstatement and,

perhaps, other equitable redress,5 the district court swept too

broadly in entering summary judgment across the board.

 

 4To be sure, even if a plaintiff adduces evidence that her
job loss was politically motivated, her employer may still
prevail by demonstrating that the employee would have been ousted
anyway, say, for unsatisfactory work performance or as a
legitimate casualty of a bona fide reorganization. See Mt.
 
Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287
 
(1977); Agosto-De-Feliciano, 889 F.2d at 1220; Hartman v. City of
 
Providence, 636 F. Supp. 1395, 1416-17 (D.R.I. 1986). But, since
 
the record before us reflects genuine questions of material fact
as to why Nereida was demoted, the defendants' explanations must
be tested in the crucible of a trial.

 5Given the myriad factual uncertainties that dot the record,
we leave to the court below three related questions: (1) whether
a job still exists into which appellant might be reinstated, (2)
whether appellant can collect back pay, and (3) if so, the amount
thereof.

 13

 D
 

 Due Process
 

 Appellant also assigns error anent the handling of her

due process claim a claim which was presumably foreclosed by

the entry of summary judgment but which the court below never

specifically mentioned in its opinion. Pressing an analogy to

Rodriguez-Pinto, 982 F.2d at 41, defendants suggest that
 

appellant waived this argument by failing to advance it

straightforwardly in the district court. We find that the claim

was adequately preserved and, therefore, direct the district

court to consider it on remand.

 While we could, of course, search to ascertain whether

summary judgment might be affirmable "on any independently

sufficient ground made manifest by the record," One Parcel, 960
 

F.2d at 204, we see no reason to decide an issue which the

district court appears to have overlooked, especially since we

must remand the case for further consideration of another claim.

See supra Part II(C). Accordingly, we vacate the entry of
 

summary judgment as it pertains to the due process claim. We

intimate no opinion as to the ultimate resolution of this aspect

of the case.

 III.
 

 Conclusion
 

 We need go no further. For the reasons stated we

affirm the district court's entry of summary judgment on

appellant's constructive discharge claim and on her First

 14

Amendment claims against the defendants in their individual

capacities; we reverse the district court's entry of summary

judgment on appellant's First Amendment claim for equitable

redress against the defendants in their official capacities; and

we vacate the order for summary judgment insofar as it purports

to foreclose appellant from further prosecution of her due

process claim.

 Affirmed in part, reversed in part, and remanded for
 

further proceedings consistent herewith. Two-thirds costs to
 

appellant.
 

 15